# United States Court of Appeals

## For the First Circuit

Nos. 10-1305, 10-2432

THE CAPABILITY GROUP, INC.,

Plaintiff, Appellant,

v.

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Boudin and Thompson,
Circuit Judges.

Peter A. Biagetti with whom Amanda B. Carozza and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. were on brief for appellant.

John F. Farraher, Jr. with whom Zachary C. Kleinsasser, Louis Smith and Greenberg Traurig, LLP were on brief for appellee.

September 9, 2011

**BOUDIN**, **Circuit Judge**.  This appeal arises out of a contract dispute between two companies: American Express Travel Related Services Company, Inc. ("AmEx") and The Capability Group, Inc. ("Capability").  AmEx is in the business of global payments and travel services, while Capability trains other companies in a method of increasing business efficiency called Six Sigma.  The lawsuit, brought by Capability against AmEx, was resolved in the latter's favor on summary judgment.

Six Sigma, broadly speaking, is a business management approach that aims at improving outputs using certain quality control and statistical techniques.  See generally Newcombe, Law Firm Convergence Meets Six Sigma, Of Couns., May 2007, at 7 (2007).  It can be adapted to many industries and embodied in training materials directed to a specific company's business operations.  Six Sigma has been used by various consultants and companies for several decades.

In the late 1990s, AmEx was assisted by another Six Sigma consultant who in turn used Capability as a sub-contractor.  After this initial exposure to Capability, AmEx contracted directly with Capability to provide Sigma Six training and related materials to AmEx employees.  The agreement, entered into on August 14, 2000, and later amended, promised Capability (1) a guaranteed, fixed base compensation of $4 million, and (2) a "gain sharing fee" to be paid

only if AmEx surpassed savings in calendar year 2001 of $106 million as a result of Capability's work.[1]

AmEx's Global Six Sigma Performance Group ("Performance Group") was responsible for tracking and for assisting with implementation of Six Sigma projects across the company. Janet Young headed the Performance Group, which comprised about 25-30 employees, and David Hudson, another Performance Group employee, created a database that tracked financial and other project information supplied by each project team for all of the hundreds of Six Sigma projects at AmEx.

In September 2000, Capability hired a consultant--BGM Services, Inc. and its principal Arthur Zentner--to assist with the development of course materials and training, and in the same month Capability and BGM offered the first training course. Capability completed its work under the agreement by December 31, 2001. There was little discussion between Capability and AmEx as to the results of the savings tracking until rather late in the process, but a few clues could have encouraged optimism on Capability's part starting in mid-2001.

---

[1]The agreement provided: "As additional compensation hereunder, [AmEx] agrees to pay [Capability] an additional fee ("gain sharing") based on the calculated benefit of the net savings to [AmEx], its parent or affiliates realized during calendar year 2001 resulting from the materials, training, coaching and development of personnel contemplated by this Agreement. The additional gain sharing payment will be calculated as set forth in this Section 8 and on Exhibit E." All of the pertinent provisions are in an addendum to this decision.

In August 2001 Zentner participated in a monthly conference call with AmEx and Capability personnel and heard an AmEx employee comment in substance that "the savings target was achieved," which Zentner took to mean that AmEx had reached $106 million in savings. In mid-December 2001, Janet Young sent an e-mail to Kevin Weiss, the CEO of Capability, relating in part to the gain sharing fee calculation; it included the statement: "Current projected Net Savings as of November, 2001: $102mm. Final calculation to be completed Dec. 31, 2001."

A couple of months later, after AmEx computed the final net savings at around $90 million, Young supplied Capability savings reports showing gross savings of $149 million, and a spreadsheet file titled "Final-TCG Contract Pay-out Final gain share analysis" that explained the $90 million net figure--but a second, never fully explained worksheet contained different numbers and specified a net savings figure of over $107 million.

In the same time frame, Capability raised questions as to whether AmEx was fully complying with confidentiality provisions in the contract designed to protect Capability's training materials. One alleged breach concerned an IBM contractor who refused to sign a confidentiality agreement before being trained with protected materials, and another involved a third-party vendor to AmEx, The Quality Group, that incorporated protected information into an online demonstration product.

-4-

On November 5, 2002, Capability rejected AmEx's calculations as inconsistent with the agreement, demanded an explanation for the conflicting spreadsheets, and asserted knowledge of new confidentiality violations related to five former AmEx employees taking confidential materials with them to new jobs. AmEx responded in March 2003 that it stood by its calculations and methodoldy, dismissing the second spreadsheet as a draft.

Following a nearly five-year hiatus, Capability filed suit against AmEx on January 29, 2008. In Count I, the complaint charged breach of contract based both on the failure to pay a gain sharing fee and on alleged breaches of the confidentiality provisions. Count II sought an accounting for disclosures or uses of the Capability materials inconsistent with the copyright license provided by the agreement. After discovery, the district court granted AmEx summary judgment on both counts.

Starting with the gain sharing fee, the district court ruled that the contract was unambiguous, that the gross savings figure generated by the system was not decisive because a net figure was contemplated, and that Capability had failed to show that the $90 million net calculation was erroneous. As to confidentiality breaches, the court found that they were largely minor or technical, and that no damages had been established. It also rejected the copyright claim on limitations grounds, and

-5-

Capability appealed only from the judgment rejecting the contract claim.

While that appeal was pending, Capability moved for relief from judgment in the district court, Fed. R. Civ. P. 60(b), arguing that its attorney's poor performance and suspension from practice shortly after summary judgment proceedings justified relief. After a hearing, the district court denied Capability's motion, and Capability timely appealed from that order. We consolidated the two appeals and now affirm.

The standard of review on summary judgment is de novo, drawing inferences in favor of the non-moving party. Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 611 (1st Cir. 2000). The contract provides that New York law governs its interpretation. Review of an order denying a post-trial motion under Rule 60(b) is for abuse of discretion, Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002), which in practice means de novo review of strictly legal determinations and deference to the extent that the denial turns on factual or judgmental determinations.

The gain sharing fee. Capability first argues that the agreement unambiguously required AmEx to use the $149 million savings figure reported by its internal savings system--without subtraction of savings not attributable to Capability's Six Sigma efforts--as the trigger for additional payment. Capability does not, however, dispute that the $149 million figure included savings

from 715 Six Sigma projects, some of which were unrelated to Capability's own work, and failed to exclude certain costs of implementing the Six Sigma program.[2]

Capability's most far-reaching argument for rejecting the net $90 million figure is that the agreement implicitly required use of the gross figure because (1) it provided that the calculations derived from AmEx's system would be determinative, and (2) no further massaging of numbers was permitted. The first proposition is true but not the second. The argument emphasizes the underscored language in the agreement:

> The gain sharing <u>shall be determined by [AmEx] using the system it uses itself</u> to internally track and report on such savings for internal business purposes. [AmEx] will provide regular reports off of this system to [Capability], redacting any confidential information as appropriate. <u>The savings calculations from [AmEx's] system shall be determinative</u> and not subject to challenge by [Capability].

But this language must be read together with the agreement's gain sharing provision. It explicitly provides that the gain sharing fee is to be "based on the calculated benefit of the <u>net savings</u> to [AmEx] . . . <u>resulting from</u> the materials,

<hr />

[2]The record shows that the $149 million was reduced to $90 million by subtracting: $43,502,206 in savings from projects that Janet Young's team determined were not connected in any manner with Capability's work; $7,131,946 in savings from projects completed before November 2000 (because the first Capability training course was not completed until December 2000); and $8.1 million in program operating costs and vendor payments.

training, coaching and development of personnel contemplated by [the] Agreement." See note 1, above (emphasis added). Exhibit E, cross-referenced in this provision, also refers to "realized actual net savings."

Nor is the language relied on by Capability inconsistent with AmEx's derivation of the net figure. AmEx's calculation did "us[e] the system" to generate a number that reflected actual net savings "shown on" and "from" the system. It then permissibly removed other savings "shown on" and "from" the system unrelated to Capability's work and--consistent with the aim of deriving a final net number--it reduced the relevant savings by the costs of implementing the Six Sigma program.

Capability points to the second sentence of the excerpt quoted above, saying that the requirement of regular reports generated by the AmEx system would be meaningless if the numbers in those reports did not establish the final figure. But Capability had good reasons to monitor the changing gross savings as they were reported, and to insist that the final reported number be a starting point for calculations, even though the final net numbers might be determined only later in the day.

Capability's fallback position is to argue first that at least the agreement should be taken to be ambiguous, permitting consideration of parol evidence. The parol evidence rule does invite resort to extrinsic evidence, such as negotiations between

the parties, where a contract's terms are unclear. But here there is nothing ambiguous in the agreement's explicit specification of net savings resulting from Capability's contribution. E.g., Teitelbaum Holdings, Ltd. v. Gold, 396 N.E.2d 1029, 1031 (N.Y. 1979).

Capability also argues that it was a shared purpose of the parties to achieve savings of $106 million. That figure was certainly an objective; but it is also evident that AmEx intended to limit its payment to Capability if that goal was not achieved. Nor is it apparent why Capability should expect to receive a performance-based payment for $59 million in savings unrelated to its own work under the contract.

Capability's final fallback argument is that there was at least a material issue of fact as to the correctness of the subtractions, and this in turn necessarily generated material issues of fact precluding summary judgment. This would indeed be a promising line of attack if Capability had attempted to identify evidence at the summary judgment stage that any one of the individual components of any of the subtracted figures--for example, a subtracted project that reduced the net savings--did result from use of Capability's training or materials.

Capability points us to no such evidence. Instead, Capability chooses to argue that the overall correctness of the $90 million calculation is globally impeached not by particular errors

but by three pieces of evidence already adverted to: an AmEx employee's statement during a conference call in August 2001, Janet Young's December 12, 2001, e-mail, and the second spreadsheet that identified $107 million in savings.

As already noted, Zentner testified at his deposition that during a conference call with AmEx, he heard an AmEx employee comment to the effect that "the savings target was achieved." But the call was among Six Sigma representatives from across AmEx, which had its own internal savings target, and the vague comment left unstated which "target" the employee was referring to--not to mention leaving unclear whether the savings were projected or actual and whether they were gross or net.

As for Young's e-mail, the sentence to which Capability points--"[c]urrent projected Net Savings as of November, 2001: $102 mm"--expressly cautioned that it was a projection, i.e., estimate, and came immediately after a warning that AmEx was in the process of adjusting savings projections as a result of the events of September 11, 2001. Capability was free to explore in discovery how the estimate was altered by events and the revising-down process; if it did so, nothing helpful to Capability has been called to our attention.

As for the mysterious $107 million spreadsheet, AmEx produced admissible evidence identifying the $90 million spreadsheet as the final calculation and explaining how it

-10-

conducted its analysis in arriving at that figure. Despite discovery, Capability has failed to adduce any meaningful evidence refuting the propriety of Capability's calculations or showing that the $107 million spreadsheet was the final version rather than some interim or incomplete calculation or projection.

Its closest attempt is a strained reading of a footnote in the $90 million spreadsheet that identified a large deduction as "categorized under a subset of Six Sigma unrelated to [Capability's] work but tracked via [AmEx's] system." Capability wishfully suggests that anything under the banner of Six Sigma had to be credited toward the gain sharing fee, regardless of whether it derived from Capability's work. This misreads the agreement for reasons already explained.

In its reply brief, Capability for the first time stresses that AmEx's spreadsheet describes the starting $149 million savings figure as being "net of costs to implement," arguing that this is inconsistent with an additional subtraction for $8.1 million in program costs; but the uncontradicted evidence from Janet Young's deposition was that the $149 million figure was net of "project cost[s] for individual projects," not overarching costs such as operating the Performance Group itself.

The reply brief also contends that an internal AmEx memorandum represents a fourth piece of evidence creating a genuine issue of material fact in stating, "Through the third quarter, we

-11-

already exceeded our goal of delivering $100 million in benefits for the year with 293 completed Six Sigma projects across the company." Nothing indicates that this is a net figure reflecting only Capability-assisted projects.

Confidentiality claims. Capability also appeals from summary judgment on its contract claim based on the agreement's confidentiality provisions. One such provision gave AmEx a license to distribute and use the materials created under the agreement for training AmEx employees as well as "contractors and consultants who [AmEx] determines are integral to [AmEx] business initiatives," provided that the latter and their employers also sign confidentiality agreements restricting their use of the materials.

The alleged breaches consisted of distributing confidential materials to contractors and consultants who had not signed, or whose employers had not signed, confidentiality agreements; allowing former employees to retain materials after they left AmEx; and permitting an unauthorized third-party company, The Quality Group, to use and distribute the materials. AmEx virtually concedes that it had in some instances not properly policed its materials or obtained the proper signatures.

However, AmEx also asserts that the breaches were minor, that none of the materials are now being distributed outside the company or have been since 2005, and that Capability has not been damaged in any of the episodes. The district judge agreed and, as

-12-

to The Quality Group's arguable unauthorized use, found that a May 2005 license by Capability granted The Quality Group use of the material in exchange for a fee paid to Capability.

Capability's position is that the materials had inherent value evidenced by AmEx's payments to Capability under the contract; and so, Capability asserts, a jury could conclude that but for AmEx's failure to secure confidentiality agreements, the recipient companies would otherwise have paid Capability for the right to use the materials. But the materials were furnished to help these third parties in AmEx's business and were not otherwise used.

The one exception--The Quality Group's incorporation of protected materials into an online demonstration product--was ultimately covered by a license and license fee. It appears from the license agreement that it covered The Quality Group's pre-license uses and, in any event, Capability does not suggest otherwise. Thus, the district judge correctly concluded that it would be double recovery to require any payment from AmEx on account of this episode.

The contract also stipulated that breaching the confidentiality provisions would amount to "irreparable and continuing damage or injury" entitling the nonbreaching party to request an injunction, as well as attorneys' fees incurred for that purpose. Capability claimed in the district court that it is

entitled to both an injunction and fees, but the district court found that no further threat of improper disclosure existed, AmEx having long since ceased providing the materials to outsiders.

Although Capability still insists that it is entitled to the injunction even without such a threat, injunctions are almost always discretionary exercises of the court's equity powers, and are rarely warranted where no threat of future harm exists.[3] The agreement's language might suffice to avoid proof of irreparable injury in the case of continuing disclosure, but the parties have no power to compel a court to grant equitable relief that the court finds to be unnecessary. E.g., Fireman's Ins. Co. of Newark, N.J. v. Keating, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990).

Capability's Rule 60(b) motion. Capability sought by post-judgment motion, Fed. R. Civ. P. 60(b), and the district court denied, relief from the judgment on the grounds that its own trial attorney's negligence and misconduct (counsel was replaced for the appeal) denied it an opportunity to fully litigate its claims. Capability contended that its trial attorney was suffering through

---

[3]Goodwin v. C.N.J., Inc., 436 F.3d 44, 49 (1st Cir. 2006) (an injunction is inappropriate when "intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm"); accord Coady Corp. v. Toyota Motor Distribs., Inc., 361 F.3d 50, 61 (1st Cir. 2004) ("[I]njunctions are normally a matter of equity and the court is not required to waste resources where there is no ongoing harm and reasonable threat of recurrence.").

personal and family distractions, undisclosed to Capability, that compromised his ability to conduct the lawsuit.

On this appeal, Capability says that the denial of such relief was error. In civil cases, inadequate representation is normally a matter to be resolved between the attorney and his client, cf. Dávila-Álvarez v. Escuela de Medicina Universidad Central del Caribe, 257 F.3d 58, 66 (1st Cir. 2001), but perhaps in unusual circumstances it could be a basis for Rule 60(b) relief. See Chang v. Smith, 778 F.2d 83, 85 (1st Cir. 1985) (reserving the question). But at a minimum this would require both incompetent performance that the client could not have forestalled and a showing of likely prejudice.

Without describing the travails of Capability's former counsel in any detail, we will assume arguendo that his performance was seriously compromised by circumstances not disclosed to his client. But Capability's Rule 60(b) motion failed to show that superior representation would likely have altered the result. On the contrary, nothing in the four pieces of omitted evidence now identified by Capability suggests that, singly or together, the outcome might have been different.

Capability first says its then counsel should have told the court the identity of the AmEx employee, Mark LeFort, who commented during the August 2001 conference call with Zentner that "the savings target was achieved"; but as already explained, the

remark is too murky to reinforce Capability's case regardless of who made it. The second piece of evidence allegedly overlooked by counsel, an internal AmEx memorandum referencing third-quarter savings, is (as we have said) similarly imprecise.

The last two items, an e-mail from AmEx to Capability containing discussion points for the contract negotiations and an internal AmEx PowerPoint presentation bearing on AmEx's internal savings goals, are also of no help to Capability. They are advanced as parol evidence of the parties' intentions as to how the agreement's gain sharing provisions should be read. But, as we have already explained, parol evidence was not admissible to contradict the unambiguous contract language.

True enough, cases often repeat the canonical language-- strictures against parol evidence to contradict unambiguous language--while sometimes seeming to find ambiguities in part because the parol evidence is itself so powerful. None of the evidence identified by Capability, whether cited to the district court originally or only in the Rule 60(b) motion, rises to this level. The denial of Rule 60(b) relief was not an abuse of discretion.

<u>Affirmed</u>.

ADDENDUM

Gain Sharing Provisions:

[8]c.  <u>Gain Sharing.</u>  As additional compensation hereunder, [AmEx] agrees to pay [Capability] an additional fee ("gain sharing") based on the calculated benefit of the net savings to [AmEx], its parent or affiliates realized during calendar year 2001 resulting from the materials, training, coaching and development of personnel contemplated by this Agreement.  The additional gain sharing payment will be calculated as set forth in this Section 8 and on Exhibit E.

(1)    The gain sharing shall be determined by [AmEx] using the system it uses itself to internally track and report on such savings for internal business purposes.  [AmEx] will provide regular reports off of this system to [Capability], redacting any confidential information as appropriate.  The savings calculations from [AmEx's] system shall be determinative and not subject to challenge by [Capability].

***

<u>Exhibit E</u>

A gain sharing payment will be made in addition to the base compensation provided for above if realized actual net savings during the calendar Year 2001 equals or exceeds $106 million.  If this threshold is not met, no gain sharing payment will be due.

No gain sharing payment will be made in connection with anticipated savings or savings not realized during the calendar year 2001.

If [AmEx's] actual net savings shown on [AmEx's] tracking system described in Section 8.c.1 of this Agreement realized during the calendar year 2001 equals or exceeds $106 million, [AmEx] will pay [Capability] a gain

-17-

sharing payment equal to $1 million plus 10% of the amount by which such actual net savings realized during the calendar year 2001 exceed $106 million; provided however, that in no event will the total gain sharing payment made under this Agreement exceed $3 million.

Confidentiality Provisions:

[5]b.  <u>License to [AmEx].</u> [Capability] hereby grants to [AmEx] a perpetual, irrevocable (subject to release by [AmEx] only under the circumstances provided in Section 9.f hereof, nonexclusive, nontransferable, worldwide license under [Capability's] copyright, patent, trade secret rights, trade name, and/or service mark to use the Course Materials, in any and all media forms, for the sole and express limited purpose of [AmEx] utilization for training as provided herein.  No licenses under any other trade secrets, patents, copyrights, mask works, trademarks, or other intellectual property rights other than the Course Materials are granted.  The license authorizes [AmEx] (i) during or after the term of this Agreement, to use, make ongoing changes to, and distribute the Course Materials and to provide associated training internally to its employees, affiliates, and employees of its affiliates; (ii) during and after the term of this Agreement, to use, make ongoing changes to, and distribute the Course Materials and to provide associated training to contractors and consultants who [AmEx] determines are integral to [AmEx] business initiatives where the quality tools and process improvement philosophy are being deployed, provided that the employers of any such contractors and consultants, and the contractors and consultants themselves, sign Confidentiality Agreements substantially in the forms set forth in Exhibits G and H hereto prior to receiving the Course Materials or participating in the training . . . .

***

-18-

g.  <u>Breach Involving Confidential Information.</u>  As set forth in Section 4 hereof, both parties acknowledge that the information, including, but not limited to the format, structure, analysis, materials and techniques that are integral to the Course Materials, and the content of the Custom Course Materials and the [AmEx] Process Improvement Course Materials is confidential and to the extent, and as set forth in this Agreement, the property of each respective party as allocated herein.  Accordingly, each party recognizes and agrees that their compliance with the covenants and agreements contained in this Agreement are reasonable and necessary for the protection of parties' rights.  Each party recognizes and agrees that any violation of any of the covenants and agreements contained in this agreement will cause irreparable and continuing damage or injury to the other party, the exact amount of which would be difficult to ascertain and for which there may be no adequate remedy at law, and that, for such reasons, among others, each respective party shall be entitled, as a matter of course, to request an injunction from any court of competent jurisdiction restraining any further such violation as well as recovery from the other party of any and all costs and expenses sustained or incurred by the complaining party in obtaining such an injunction, including without limitation reasonable attorneys' fees.  Such right to request an injunction (and to recover such costs and expenses) shall be cumulative and in addition to any other rights and remedies to which the complaining party may be entitled.