# United States Court of Appeals
## For the First Circuit

No. 12-2376

WILLIAM M. DANIELS,

Appellant,

v.

WARREN E. AGIN, Chapter 7 Trustee, and WILLIAM K. HARRINGTON,
United States Trustee for Region 1,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Kayatta, Circuit Judges.

Timothy J. Burke, with whom Burke & Associates was on brief, for appellant.
John G. Loughnane, with whom Charlotte L. Bednar and Eckert Seamans Cherin & Mellott, LLC were on brief, for appellee Warren Agin.
Cameron M. Gulden, with whom Ramona D. Elliott, Deputy Director/General Counsel, Executive Office for U.S. Trustees, Department of Justice, P. Matthew Sutko, Associate General Counsel, Executive Office for U.S. Trustees, Department of Justice, John P. Fitzgerald, Assistant United States Trustee, Wendy L. Cox, and Jennifer L. Hertz, were on brief, for appellee William Harrington.

November 25, 2013

**KAYATTA, Circuit Judge**.  Ruling on motions for summary judgment in a bankruptcy proceeding, the bankruptcy court made two determinations that are the primary subject of this appeal.  First, the court ruled that the debtor failed to maintain his profit-sharing plan in substantial compliance with the applicable tax laws.  This ruling meant that assets in the profit-sharing plan and two IRAs funded with plan assets were part of the bankruptcy estate, available to satisfy the claims of creditors.  Second, the bankruptcy court ruled that the debtor intentionally failed to disclose, and in fact deliberately concealed, the existence of the two IRAs into which the debtor had transferred assets from his profit-sharing plan.  This ruling provided alternative grounds for treating the IRAs as nonexempt.  It also provided the basis for the bankruptcy court to revoke the debtor's discharge.  Daniels, the debtor, challenges both rulings on appeal.  For the reasons set out below, we affirm.

## I. Background

Both Daniels and the Chapter 7 Bankruptcy Trustee, Appellee Agin, moved for summary judgment on the question of whether Daniels's profit-sharing plan was exempt from inclusion in the bankruptcy estate.  In accord with Rule 56.1 of the Local Rules of the District of Massachusetts,[1] each filed a statement of

---

[1]  Mass. Local Rule 56.1 is made applicable to bankruptcy proceedings by Mass. Local Bankruptcy Rule 7056-1.

material facts that they claimed were undisputed. Under the rule, each was then required to file a statement in response to the other's statement of material facts, identifying which facts were disputed, with citations to record evidence establishing the existence of a dispute. Agin did not file such a responsive statement, instead filing an opposition brief and moving to strike Daniels's motion, "reserv[ing] the right to object to the introduction of" documents offered in support of Daniels's motion. Daniels did file a response, but it rarely referred to record evidence.

The bankruptcy court made sense of the procedural defalcations by comparing Agin's statement of material facts with Daniels's two statements and deeming all of Agin's averments to be admitted except where these documents conflicted. Without suggesting that the bankruptcy court was required to grant such an indulgence, we will construe the record in the same manner and apply the same approach to any part of Daniels's statement of material facts that Agin did not adequately dispute.

## A. Daniels's Retirement Accounts

William Daniels was engaged in a decreasingly profitable business as a broker of fishing boats. He was also the trustee, administrator, employer and sole participant in the William Daniels Profit-Sharing Plan ("Plan"). The Plan was a prototype plan obtained through MassMutual Financial Group. MassMutual, however,

did not manage the Plan or approve its transactions. From time to time, MassMututal received letters from the Internal Revenue Service ("IRS") opining that the form of the prototype plan qualified it for favorable tax treatment. Nothing in those letters, however, purported to bless the manner in which the Plan was operated.

Before 1988, Daniels's wife had been the beneficiary of a trust, the Walker Realty Trust ("Realty Trust"). Daniels maintains that the Realty Trust is a Massachusetts nominee trust, and so is only a titleholding device for its beneficiaries. Daniels's wife assigned her beneficial interest to the Plan in 1988. The Plan paid fair value for the real estate held by the Realty Trust.

Since 1988, the Realty Trust has engaged in a number of real estate transactions, including transactions with Daniels's son and with the daughter of Tom Florence, a man who had provided services for the Realty Trust. All transactions with Mr. Florence and his family were for fair value.

Daniels's uncle, Maurice Lopes, lived with Daniels and the two held several joint accounts. Jensen v. Daniels, 57 Mass. App. Ct. 811, 813 (Mass. App. Ct. 2003). After Lopes died in 1996, Daniels withdrew money from those accounts and placed some into the Plan. Id. at 813-14. Daniels reported the money from the joint accounts that he put into the Plan as a tax deduction, and avers

-4-

that the transaction was never challenged "by a tax authority." Daniels's aunt, as the executrix of Lopes's estate, later sued Daniels and his wife, alleging that they were not entitled to those funds. The probate court entered judgment against Daniels and his wife. The Massachusetts Appeals Court affirmed the judgment in the amount of $238,538.16, plus interest, but only as to Daniels. Id. at 819-20. That judgment was not satisfied before Daniels filed for bankruptcy. Including interest, it totaled more than $440,000.00 by 2007.

In or around February 2007, Daniels transferred $469,894 from the Plan into two new MassMutual Individual Retirement Accounts (IRAs) held in his own name.

## B. Daniels's Bankruptcy

Approximately six months later, Daniels filed for Chapter 13 bankruptcy. That bankruptcy petition was later converted to a Chapter 11 bankruptcy, and then into a Chapter 7 bankruptcy.

Bankrupt debtors must file several bankruptcy schedules, including Schedule B (in which a debtor identifies his personal property) and Schedule C (in which he lists the property that he claims is exempt from the bankruptcy estate). Schedule B requires debtors to disclose any "[i]nterests in IRA, ERISA, Keogh, or other pension or profit sharing plans," and directs debtors to "[g]ive [p]articulars." On both his Schedules B and C, Daniels wrote: "As of 8/06/07: Debtor's 401-qualified pension: 'William Daniels

Profit-Sharing Plan' (tax ID # [XX-XXX]2459/ formed 8/15/88; approved by IRS 08/07/01), held by Walker Realty Trust, Wm M. Daniels, Trustee: inventory and valuations separately documented[.]"[2] Daniels failed to mention the IRAs on his schedules. Rather, he showed all of the funds--both those remaining in the Plan and moved out of the Plan--as still being owned by the Plan.

During his bankruptcy proceedings, Daniels testified at three creditors' meetings. At the September 25, 2007, meeting, he affirmed that he had read the schedules before signing them. It appears that he again avoided any mention of the two IRAs, instead describing the Plan itself as "an IRA, qualified ERISA."

Prior to another creditors' meeting in April 2009, Daniels and his attorney submitted revised figures for the profit-sharing plan to Trustee Agin, reporting a reduced Plan value of $573,117.38. That total amount, as best one can infer from the record, still included the funds in the IRAs. At the creditors' meeting, Daniels again confirmed that he had signed the schedules, and that they were accurate when filed. When asked where the proceeds had gone from the sale of several Realty Trust properties, Daniels replied that they were "invested with Mass Mutual in annuities." Asked whether the Realty Trust or the Plan owned the

---

[2] Daniels signed the schedules, affirming under penalty of perjury that they were true and correct to the best of his knowledge.

annuities, he falsely claimed that the Plan owned them.  When asked about any life insurance, he responded "I have the annuities in my retirement program[,]" which, he confirmed, were owned by the Plan.

Daniels did not turn over any documents relating to the two IRAs at this meeting.[3]  After that meeting, Daniels provided some documents to Trustee Agin, including account statements indicating that the Plan held the beneficial interest in the Realty Trust and a cash account with $71,169.62.  Additional correspondence and documents sent from Daniels's bankruptcy counsel, Atty. Cohen, to Agin in April and May, 2009, contained no discussion of the IRAs.

Daniels received a Chapter 7 discharge on July 1, 2009.

## C.   The IRS Audit and IRA Rollover

In 2008-2009, the IRS audited the Plan's 2006 tax return. During the audit, the IRS requested a variety of information, including:  documentation relating to the Plan's form (in order to verify its "qualification"), information about the Plan's relationship to the Realty Trust, and information relating to a

---

[3]  Some of Daniels's evidence suggests that he claimed to have turned over information relating to the two IRAs at the April 2009 creditors' meeting.  It does not appear, however, that Daniels cited to such evidence in opposing summary judgment.  It is not the court's job to "ferret out and articulate the record evidence material to the appellant's claims." Barry v. Moran, 661 F.3d 696, 699 n.3 (1st Cir. 2011) (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 32 n.16 (1st Cir. 2009)) (internal quotation marks omitted); see also Fed R. Civ. P. 56(c)(3) (at summary judgment, a court need consider only cited materials, but may consider others).

loan from the Plan to Daniels's son.  At the end of the audit, the IRS sent Daniels a letter that stated simply: "We have completed our examination of your return(s) for [2006] and have accepted the return(s) as filed.  However, during the examination we noted certain items indicated on the enclosure, which require your attention."  The enclosure noted that a loan to Daniels's son, a "disqualified person," had occurred.  It then noted: "[the l]oan was corrected by the full amount being repaid. The [26 U.S.C. §] 4975(a) tax calculated was deminimus and Form 5330 was not pursued."[4]  The letter explained that "corrected" meant

> undoing the [prohibited] transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards.  The loan has been [re]paid in full. No further action required.

Also in 2009, Daniels rolled one of the two MassMutual IRAs over into a new, third IRA held with Prudential.

## D.    The Turnover and Revocation Actions

In August and September, 2009, Trustee Agin filed an objection to Daniels's claim of exemption for the Plan assets, and an adversary complaint seeking to have those assets turned over to the Trustee.  Agin argued, among other things, that the Plan was not exempt from the bankruptcy estate because Daniels had engaged

---

[4]  Form 5330 is the IRS's form for the "Return of Excise Taxes Related to Employee Benefit Plans."  See IRS Return of Excise Taxes Related to Employee Benefit Plans, available at http://www.irs.gov/pub/irs-pdf/f5330.pdf.

the Plan in transactions prohibited by the Internal Revenue Code, including transactions with Daniels's family members.

On March 15, 2010, Daniels sought leave from the bankruptcy court to wind-up the Plan by, in large part, converting Plan assets into IRAs. Part of that motion stated: "Plan regulations controlling actual retirement begin to mandate a series of timely and proportional actions . . . for example . . . (b) re-allocation (altering the proportion of overall holdings from 100% 'profit-sharing' funds to partial profit-sharing and partial IRA . . . .[)]" The motion did not disclose that the bulk of the former Plan assets had three years earlier been moved into the undisclosed IRAs. To the contrary, it clearly implied that no such transfer had occurred, hence the motion. That motion was denied.

There appears to be no dispute that, also around March 15, 2010, Atty. Cohen produced to Agin's counsel documents that included some account statements and documents for the IRAs. Shortly thereafter, Agin's counsel sent Atty. Cohen an email memorializing a recent conversation in which Cohen reported that Daniels was working on providing information explaining the reduction in the value of the Plan as reflected in the Plan's 2008 tax return.

In April 2010, Atty. Cohen sent Agin's counsel unsigned interrogatory responses. One response, to a question about what assets the Plan held, included a reference to one of the MassMutual

IRAs. (That response suggested that the Plan's value was just over $250,000, plus the value of a vacant lot.) Shortly thereafter, Atty. Cohen wrote to strike that reference, noting (correctly) that "[t]his is an IRA account and not a part of the Debtor's Profit-Sharing Plan."

In May 2010, Daniels's counsel again provided a handwritten account of the Plan's 2010 value to the trustee, now listing the total value as $103,814.08. Around the same time, Daniels provided Agin with a sheet entitled "2009 Work Sheet for William Daniels Retirement Plans for JBPW Corporation 5500 Form Filing."[5] On the one-page worksheet, Daniels listed by name, account number, and dollar amount his annuities, including the two Individual Retirement Annuities that are the subject of this dispute (one of which had, by then, been rolled into a Prudential annuity). Beneath the annuities, the worksheet lists a second category of assets, labeled "William M. Daniels Profit Sharing Plan." That list only included a vacant lot and a brokerage account, with a total combined value of $107,267.33. In June, 2010, Daniels failed to appear for a Rule 2004 examination.

In response, Trustee Agin moved to have the IRAs turned over to the bankruptcy estate. That motion was denied but Agin was

_____

[5] JBPW Corporation appears to be an accounting firm that prepared tax returns for the Plan. Form 5500 is the annual return for employee benefit plans. See Annual Return/Report of Employee Benefit Plan, available at http://www.irs.gov/Retirement-Plans/Form-5500-Corner.

allowed to amend the original turnover complaint (directed at the Plan assets) to add the IRAs, which he did in July 2010.  Also in July, 2010, the U.S. Trustee[6] filed an adversary case (No. 10-01180) asking that Daniels's bankruptcy discharge be revoked.

On March 8, 2011, Agin moved for summary judgment in the turnover action.  On April 4, 2011, through his tax attorney (who became his successor counsel for the adversary action), Daniels opposed Agin's motion for summary judgment and cross-moved for judgment.  Agin moved to strike the cross-motion, and filed a brief opposing Daniels's arguments.

After oral argument, the bankruptcy court granted Agin's motion on June 16, 2011.  The court found that the Plan did not qualify for exemption from the bankruptcy estate, and thus neither did the IRAs, whose funds derived from the Plan.  Alternatively, the court held, the IRAs should be part of the estate because Daniels had intentionally concealed them throughout his bankruptcy proceedings.

Daniels asked the bankruptcy court to "alter, amend and reconsider" its ruling.  He emphasized that because certain IRS manuals proved that the Plan audit had been broad, and because the only issue raised by the IRS (the prohibited loan to Daniels's son) had been corrected, the IRS's audit result should be read as a

---

[6]  At the time, the U.S. Trustee was not Appellee Harrington, but an acting Trustee.  We will refer throughout this opinion simply to the "U.S. Trustee."

-11-

finding that the Plan was qualified and tax-exempt.[7]  Regarding his

intent to conceal assets, Daniels argued that he had informed his

attorney about the IRAs, disclosed the full amount of the funds,

and "provided evidence of the IRAs to the Trustee at his Section

341 meeting and in documentary form."  (Which creditors' meeting,

and what he claimed to provide, was unclear.)  In an accompanying

affidavit, Daniels swore that he did not know why the phrase "100%

profit-sharing" appeared in his March, 2010, motion seeking leave

to wind up the Plan, but that he intended no misrepresentation and

had not concealed anything.  Daniels's motion to alter or amend the

judgment was denied after a hearing on August 12, 2011.  Daniels

appealed to the district court.

In November, 2011, the U.S. Trustee moved for summary

judgment in the revocation action based on the collateral estoppel

effect of the bankruptcy court's ruling in the turnover action

regarding Daniels's intent to conceal the IRAs.  Daniels, through

his successor counsel, opposed that motion  on December 12, 2011.

On December 29, 2011, Daniels filed a Rule 60 Motion for

Relief  from  Judgment  in  the  turnover  action  claiming  excusable

---

[7]     Daniels  also  argued  that  the  bankruptcy  court  had
incorrectly stated that Daniels had enriched his family and friends
through his transactions, pointing to his assertion that all
transactions were for fair value.  Daniels does not press this
point on appeal.

neglect and newly discovered evidence.[8]    He claimed to be "blameless" for the errors in his disclosures and filings, which he attributed to Atty. Cohen's medical state.   Among other things, Daniels proffered:

- excerpts from his December, 2010 deposition, in which he discussed using Plan funds to purchase annuities;
- part of a fax he sent to Atty. Cohen on August 6, 2007, suggesting corrections to his Schedule B (only some of which, arguably, are reflected in the schedules submitted to the bankruptcy court); and
- a letter he sent to Atty. Cohen, dated March 15, 2010, requesting changes to the motion filed on that date (which referred to "100% profit-sharing," as discussed above).   The requested changes clarified that two IRAs had already been purchased. They were not reflected in the motion as filed with the bankruptcy court.

He argued that this, along with previous evidence, proved that he had not effected any fraud.

The bankruptcy court denied Daniels's Rule 60 motion. The court rejected the attempt to blame the summary judgment finding of bad faith on Atty. Cohen because Daniels had not explained why his successor counsel had not raised the issue of Atty. Cohen's health in the summary judgment briefing and because parties customarily bear the burden of their attorneys' mistakes. The bankruptcy court likewise rejected the appeal to "new" evidence, observing that the evidence had been available to counsel and/or Daniels all along.   Finally, the court noted, even if the

---

[8]    Fed. R. Civ. P. 60 is made applicable to bankruptcy proceedings under Fed. R. Bankr. P. 9024.

evidence was newly discovered, it arguably showed that Daniels had affirmed information that he knew to be inaccurate.

Daniels again sought reconsideration, stressing Atty. Cohen's medical condition and offering more evidence to suggest that Cohen was at fault for any appearance of misrepresentation. That evidence included (again) the March 15, 2010, letter to Atty. Cohen, along with an email from Cohen to Daniels, sent three days after Trustee Agin filed his motion for summary judgment. Cohen suggested in that email that, due to his own ill health, Daniels's tax attorney should take over the case.

The bankruptcy court denied the motion for reconsideration, as well as two renewals of that motion, one purporting to explain the division of labor between successor counsel and Cohen. Daniels again appealed to the district court.

The bankruptcy court held a hearing on the U.S. Trustee's motion for summary judgment on January 13, 2012. The court granted the motion, holding that its previous finding of intentional concealment entitled the U.S. Trustee to judgment in the revocation action. Daniels again appealed to the district court.

All three appeals were consolidated. On September 30, 2012, the district court affirmed all three rulings. Daniels's request for rehearing was denied. Daniels now appeals.

## II. Jurisdiction and Standard of Review

This appeal challenges decisions of the bankruptcy court entering judgment as a matter of law under Federal Rule of Bankruptcy Procedure 7056. This Court has jurisdiction over this matter under 28 U.S.C. § 158(d)(1), which grants us jurisdiction to hear appeals of final decisions entered by district courts hearing bankruptcy appeals under 28 U.S.C. § 158(a).

As we recently explained in In re Moultonborough Hotel Grp., LLC, 726 F.3d 1 (1st Cir. 2013), the "legal standards traditionally applicable to motions for summary judgment . . . apply without change in bankruptcy proceedings." Id. at 4; see generally In re Varrasso, 37 F.3d 760, 762-63 (1st Cir. 1994). Accordingly, "our inquiry is whether any 'genuine issue of material fact exists' and whether 'the moving party is entitled to judgment as a matter of law.'" In re Moultonborough, 726 F.3d at 4 (quoting Soto-Rios v. Banco Popular de P.R., 662 F.3d 112, 115 (1st Cir. 2011)). A dispute is genuine if a reasonable factfinder "could resolve the point in favor of the non-moving party." Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under governing law. Sec. & Exch. Comm'n v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008). In conducting our inquiry, "'we cede no special deference to the determinations made by the district court' and instead 'assess the bankruptcy court's decision directly.'" In re Moultonborough, 726 F.3d at 4 (quoting City

-15-

Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 87 (1st Cir. 2011)). And because the bankruptcy court entered judgment as a matter of law, that assessment on appeal is de novo. In re Spookyworld, Inc., 346 F.3d 1, 6 (1st Cir. 2003).

### III. Analysis

We explain first why the bankruptcy court correctly ruled on summary judgment that the Plan assets (including the funds transferred to the IRAs) were not exempt from inclusion in the bankruptcy estate, and therefore are available to creditors. We then explain why we agree that Daniels's conduct throughout his bankruptcy proceedings indisputably demonstrated at least a reckless indifference to the truth of material information that he provided to the court and to the Trustee.

### A.   The Plan Assets Are Not Exempt from the Bankruptcy Estate.

Section 522(b)(3)(C) of the Bankruptcy Code lets debtors (like Daniels) who rely on state-law bankruptcy exemptions exempt retirement funds from their bankruptcy estate if the money is held in "a fund or account that is exempt from taxation under section 401 . . . of the Internal Revenue Code of 1986." 11 U.S.C. § 522(b)(3)(C).[9] (Section 401 deals with trusts that are a part of

---

[9] Daniels's original Schedule C listed the Plan as exempt under 29 U.S.C. § 1056(d). The parties now appear to agree that § 522(b)(3)(C) determines whether the Plan is exempt; to the extent that Trustee Agin intended to argue that Daniels never properly exempted the Plan, he has waived that claim by addressing it perfunctorily in a footnote. See Soto-Fonalledas v. Ritz-Carlton

-16-

profit-sharing plans. See 26 U.S.C. § 401(a).) The bankruptcy court found that Daniels's Plan was not exempt, because the Plan's operation repeatedly violated applicable tax laws. The court focused in particular on sections 401 and 4975 of the Internal Revenue Code (hereinafter, the "Tax Code"). 26 U.S.C. §§ 401, 4975.

Section 4975 limits the sorts of transactions that retirement plans may engage in. It does so by imposing additional taxes, with certain exceptions, on "prohibited transactions" such as loans or property sales between a retirement plan and, for example, a plan fiduciary, the employer, a person providing services to the plan, or family members of other disqualified persons. See id. at § 4975 (a), (c), (d), (e). Any transaction whereby a plan fiduciary "deals with" plan assets "in his own interests or for his own account," or receives consideration connected to a transaction involving plan assets, is also prohibited. Id. at § 4975(c)(1)(E), (F).

The bankruptcy court found that the Plan had engaged in at least eight substantial transactions prohibited by section 4975. In re Daniels, 452 B.R. 335, 349-50 (Bankr. D. Mass. 2011). The bankruptcy court also found that Daniels violated section 401(d) of the Tax Code by putting money from the Lopes account into the Plan and by allowing the Plan to accept the assignment of Daniels's

San Juan Hotel Spa & Casino, 640 F.3d 471, 475 n.2 (1st Cir. 2011).

-17-

wife's interest in the Realty Trust.[10]  Id. at 350.  In light of all this, the bankruptcy court concluded that Daniels's management practice was to engage the Plan repeatedly in substantial transactions prohibited by the Tax Code.

On appeal, Daniels does not directly critique these findings per se.  Instead, he argues that when the IRS closed the Plan's 2006 audit without disqualifying the Plan or imposing additional taxes, it created a presumption that the Plan assets are exempt from the bankruptcy estate.  The statutory basis for Daniels's argument is 11 U.S.C. § 522(b)(4), which provides that for the purposes of section 522(b)(3)(C):

> (A) If the retirement funds are in a retirement fund that has received a favorable determination under section 7805 of the [Tax Code], and that determination is in effect as of the date of the filing of the petition . . ., those funds shall be presumed to be exempt from the estate.
> (B) If the retirement funds are in a retirement fund that has not received a favorable determination under such section 7805, those funds are exempt from the estate if the debtor demonstrates that—
> > (i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and
> > (ii) (I) the retirement fund is in substantial compliance with the applicable requirements of the [Tax Code]; or (II) the retirement fund fails to be in substantial compliance with the applicable requirements of the [Tax Code] and the debtor is

---

[10]  Tax Code section 401(d) provides that, to be qualified for favorable tax treatment, profit-sharing plans' trusts must restrict plan contributions made on behalf of any "owner-employee[s]" to those made "only with respect to the earned income of such owner-employee which is derived from the trade or business with respect to which such plan is established."  26 U.S.C. § 401(d).

not materially responsible for that failure.

11 U.S.C. § 522(b)(4).[11]

Section 7805 of the Tax Code, to which section 522(b) refers, generally authorizes the Secretary of the Treasury to enact regulations. While the Secretary has established procedures for obtaining determinations that the form of the plan is compliant, 26 C.F.R. § 601.201,[12] Daniels points us to no regulation providing that the results of an audit could be deemed to be a favorable determination within the meaning of Bankruptcy Code section 522(b)(4).

Even assuming that the results of an audit can serve as a favorable determination under section 522(b)(4) of those matters examined in the audit, we would reject Daniels's contention that an audit closure may be deemed to be a "favorable determination" of facts or issues of which the IRS was not made aware.[13] See In re

---

[11] Daniels does not argue that he was not responsible if the Plan violated the tax laws. Nor could he readily do so; he admitted that he was the Plan administrator and Trustee.

[12] Daniels objects that the courts below cited IRS Publication 794 to establish that a favorable determination letter expresses the IRS' opinion about the qualification of a plan's form. Because the courts could have found the same information in IRS regulations and our previous opinion, see Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 85 (1st Cir. 2005), the error, if any, was harmless.

[13] Daniels argues that IRS determinations are presumed to be correct, citing Welch v. Helvering, 290 U.S. 111, 115 (1933) among others. We do not quarrel with the principle, but it helps Daniels little. No one disputes that under section 522, a favorable determination creates a presumption of compliance. See In re Daley, 717 F.3d 506, 508-511 (6th Cir. 2013). In any event, this

-19-

Plunk, 481 F.3d 302, 307 (5th Cir. 2007) ("The IRS never considered Plunk's abuse of Plan assets or audited the Plan to determine whether it was operationally qualified despite Plunk's actions. Therefore, the bankruptcy court . . . [was] permitted to reach an independent decision regarding the Plan's qualified status . . . .").[14]  To accept Daniels's argument that a closed audit blesses all operations of a plan would be to reward concealment in audits and to presume that all audits are all-encompassing.[15]

Daniels argues that the IRS necessarily found the Plan's operational history "acceptable," because it looked at several Plan tax returns and transactions, only objected to one, and neither disqualified the Plan nor assessed additional taxes.  The problem

case is unlike those in which a party challenges an actual IRS ruling or assessment.  Cf., e.g., Welch, 290 U.S. at 115; Hostar Marine Transp. Sys., Inc. v. United States, 592 F.3d 202, 208 (1st Cir. 2010).  Here, Daniels asks us to find that the IRS made a determination regarding events of which it was by all appearances unaware.

[14] Daniels relies heavily on Matter of Youngblood, 29 F.3d 225 (5th Cir. 1994).  There, a bankruptcy court deemed a retirement plan unqualified and thus available to creditors under Texas law, despite two favorable determination letters and an audit wherein the IRS declined to disqualify the plan. The Fifth Circuit reversed.  As the Fifth Circuit later explained, however, the IRS in Youngblood had actually considered "the misconduct at issue and decided not to disqualify the plan."  Plunk, 481 F.3d at 306. Here, as with the never-audited plan in Plunk, it appears that the IRS was unaware of at least some of the disqualifying conduct.

[15] Because nothing in the Internal Revenue Manuals cited by Daniels proves that the IRS was aware of all of the challenged transactions, we need not address Trustee Agin's arguments regarding waiver and the significance of such Manuals.

-20-

is that he identifies no evidence that the IRS reviewed, or was even aware of, at least four transactions relied on by the bankruptcy court in granting summary judgment.[16]  These included: (1) the land and loan transactions with Tom Florence's daughter; (2) a loan from Daniels's wife's other trust, the BD Realty Trust, to the Plan; (3) the Plan's investment in B.I.T.C.O., a salvage effort in which Daniels also personally invested; and (4) the deposit of funds from the Lopes account into the Plan.[17]  Cf. In re Daniels, 452 B.R. at 350-51.  As noted above, Daniels has not directly challenged the bankruptcy court's rulings that each of these substantial and material transactions was barred by sections 4975 or 401(d).  Nor does he challenge the bankruptcy court's conclusion that profits from prohibited transactions are not exempt from the bankruptcy estate under section 522(b)(3)(C), or that a pattern of prohibited transactions and violations of section 401(d) constitutes material noncompliance with applicable tax laws under section 522(b)(4).

---

[16]  Although Daniels included much, if not all, of his correspondence with the IRS in his summary judgment response, he did not include all of the attachments and documentation that accompanied that correspondence.

[17]  Daniels avers that he reported this deposit as a deduction on his tax return, and that it was never challenged by any "tax authority."  Given the lack of information about what exactly the IRS was told, however, we find that Daniels did not create an issue of fact as to the IRS' awareness of the details of the transaction.

These were not, moreover, insubstantial or isolated transactions. At least $20,000 (but possibly $53,000) went from a retirement account to pay expenses for B.I.T.C.O. Daniels's transactions with the daughter of Tom Florence appear to have involved repeated conveyances of a property, and a loan of at least $125,000. Most importantly, some portion of the more than $238,000 that Daniels took from the Lopes accounts went into the Plan. See Jensen v. Daniels, 57 Mass. App. Ct. 811, 813-14 (2003). We therefore find that there is no genuine issue of material fact that the Plan did not substantially comply with applicable tax laws.

Having thus rejected Daniels's sole challenge to the ruling that the Plan was not in substantial compliance with the Tax Code--that the bankruptcy court's conclusion was precluded by the Plan's audit result--we affirm the judgment that the Plan assets were not exempt from the bankruptcy estate.

## B.    Daniels Indisputably Demonstrated a Reckless Indifference to the Truth of Material Information During His Bankruptcy Proceedings.

Daniels does not challenge the bankruptcy court's conclusion that the IRAs purchased with the assets of a noncompliant and nonexempted Plan are themselves necessarily non-exempt. See In re Daniels, 452 B.R. 335, 351 (Bankr. D. Mass. 2011). Ordinarily, then, we would not need to reach the bankruptcy court's alternative ruling, which barred Daniels from claiming the

IRAs as exempt because he "intentionally conceal[ed] or fail[ed] to disclose estate property" through "a pattern of bad faith concealment [of the IRAs] that spans the entire three and a half years of [his] bankruptcy case." Id. at 351-52. That alternative holding, however, became the basis for the entry of summary judgment in the revocation action, itself the subject of appeal.[18] We therefore turn to the question of whether the bankruptcy court correctly ruled on summary judgment that Daniels intentionally concealed material information about his financial circumstances.

The bankruptcy court held that "if a debtor intentionally conceals or fails to disclose estate property," he will be barred from claiming that property as exempt, even if it would have been exempt had it been properly scheduled and claimed. Id. at 351 (quoting In re Wood, 291 B.R. 219, 226 (B.A.P. 1st Cir. 2003)). Both parties presume, and hence we need not decide, that the bankruptcy court had the authority to deny an exemption (as opposed to a proposed amendment of bankruptcy schedules) purely for bad faith by the debtor. Cf. 11 U.S.C. § 522(g), 4 Collier on Bankruptcy ¶ 522.08 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). Daniels does contend, however, that the bankruptcy court's order allowing him to amend his Schedule B precluded its later finding of bad faith. We disagree. Under the circumstances

---

[18] Daniels has not argued on appeal that an alternative holding may not be given collateral estoppel effect. We express no opinion on the matter.

of this case, the bankruptcy court was entitled to grant Daniels leave to amend his schedules while in effect preserving the issue of bad faith for decision at summary judgment, for which briefing was already nearly complete.

The parties each add a refinement to the standard recited by the bankruptcy court: Daniels asserts that whatever is concealed must be material, and Agin contends that reckless indifference to the truth is tantamount to intentional concealment. Cf. In re Tully, 818 F.2d 106, 110-11 (1st Cir. 1987) (noting that discharge can only be denied under § 727(a)(4)(A) if the debtor knowingly and fraudulently made a material misstatement, and that "reckless indifference to the truth" has "consistently been treated as the functional equivalent of fraud for purposes of" that subsection). Neither party appears to object to the other's refinement, and so we assume both to be correct.

### 1.    The Omitted Information Was Material.

Daniels argues that because he disclosed the total amount of his retirement funds, his failure to specifically identify the IRA accounts was not material. Therefore, he claims, that failure cannot support a finding of intentional concealment. Information omitted from a bankruptcy petition or schedule is material if it is "pertinent to the discovery of assets, including the history of a bankrupt's financial transactions." In re Mascolo, 505 F.2d 274,

277 (1st Cir. 1974) (affirming a revocation of discharge where the debtor failed to disclose closed accounts).

> It cannot be doubted that the creditors are entitled to inquire into what property has passed through the bankrupt's hands during a period prior to his bankruptcy . . . wide latitude must be accorded to such an examination, and . . . the materiality of [an allegedly] false oath will not depend upon whether in fact the falsehood has been detrimental to the creditors.

Id. at 278 (quoting In re Slocum, 22 F.2d 282, 285 (2d Cir. 1927)). Here, the fact that Daniels had recently moved nearly $470,000 from a profit-sharing plan into two IRA accounts held in his own name is most certainly the type of information about the nature and history of Daniels's assets and transactions that any trustee or creditor might wish to examine or consider. As evidenced by the fact that the Trustee's original turnover request covered only the assets in the Plan, the failure to list the IRAs could have had a huge impact on the estate and creditors had the IRAs not been later identified and the turnover request amended. The IRA information was material.

### 2. The Record Compels the Conclusion that Daniels was Recklessly Indifferent to the Truth.

Courts use special caution in granting summary judgment as to intent. Intent is often proved by inference, after all, and on a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party. See Sec. & Exch. Comm'n v. Ficken, 546 F.3d 45, 51-52 (1st Cir. 2008) (summary judgment on scienter is unusual, but proper where the non-movant relies on

-25-

conclusory allegations or insupportable inferences).  We have previously considered the question of summary judgment with regard to a debtor's fraudulent intent in several cases.  Two opinions, though arising in the context of denying a Chapter 7 discharge, are particularly helpful here.

In In re Varrasso, 37 F.3d 760, 762 (1st Cir. 1994),  we reviewed the grant of summary judgment barring a discharge on the ground that the debtors had knowingly and fraudulently made a false oath or account.  There was no dispute that the debtors had failed to include assets on their bankruptcy schedules--a bank account with a balance of $100, and home furnishings worth roughly $2,000-- which were not uncovered until their creditors' meeting.  Id.  The debtors, however, argued that they had no intent to hinder the proceedings or defraud any creditors, and their attorney averred that disclosure had been made at the earliest possible opportunity. Id.  We reversed the grant of summary judgment against the debtors, noting in particular that the "relatively small value" of the omitted assets cut against an inference of fraud.  Id. at 764. Even so, we stressed that in some cases, summary judgment on the issue of intent is permissible.  Id.

We encountered such a case in In re Marrama, 445 F.3d 518 (1st Cir. 2006).  There, we affirmed summary judgment denying the debtor a discharge on the grounds that he had transferred assets less than a year before his bankruptcy, intending to hinder, delay,

or defraud a creditor. See id. at 521-22. The debtor had refinanced his vacation home, transferred most of the money to his girlfriend, and then placed the home in a spendthrift trust (of which he was the beneficiary). Id. at 520.

Marrama argued that he had properly recorded the home transfer with the local deeds office and that he had reported the trust, its holdings, and his interest in it during the bankruptcy. Id. at 523-24. He also noted that his attorney swore to leaving information off of the bankruptcy schedules by mistake. Id. at 523. We rejected his explanations as insupportable, however. Id. at 524. Marramma had admitted to transferring his home "to protect it," and undisputed facts supported nearly every indicator of fraud that we use to assess bankruptcy-related property transfers (for example, he transferred his asset to someone close to him, retained a beneficial interest in it, received no valuable consideration for the transfer, and was facing seizure of his assets). Id. at 522-24. We therefore found that the record permitted no inference but that of fraud in the transfer. Id. at 524.

While this case differs from both Varrasso and Marramma, we find it falls in line more with the latter than the former. Daniels created the IRAs less than seven months before filing for bankruptcy protection, and in the wake of an affirmance of a large judgment against him. Schedule B clearly and expressly solicited the listing of "interests in IRA[s]" and demanded the

"particulars."  The funds moved into the IRAs represented perhaps 50% of his total assets.  It is inconceivable that, when completing his schedules, Daniels somehow forgot that he had recently moved roughly one-half million dollars entirely outside his Plan into two IRAs.  His suggestion that he thought it was okay to group all retirement-type funds under his profit-sharing plan because that was how he completed his 2007 tax return carries little weight because that return was filed after he had filled out his bankruptcy schedule.

Daniels then managed to avoid correctly explaining the IRAs throughout his various creditors' meetings.  Referring to the Plan itself as an IRA at his 2007 creditors' meeting is not, as Daniels argues, an adequate disclosure.  And while he referred in the April, 2009 creditors' meeting to having purchased MassMutual Annuities, he stated flatly and falsely that those annuities were "held by the pension plan now."  Yet, in filling out the July 2009 request to roll one of the IRAs over from MassMutual to Prudential, Daniels exhibited no confusion about who held what--under "Owner Name/Plan Name," he typed "William M[.] Daniels."

Daniels failed to take advantage of several other opportunities to clear up the status of the IRAs.  For example, in responding to an interrogatory asking what assets the Plan held, Daniels for the first time clearly stated that the MassMutual IRA mentioned in the draft interrogatory response was not part of the

Plan. Yet, in response to a request for the details of every "distribution, loan, transfer or withdrawal from the Plan's funds or assets," he still failed to provide any information relating to the IRAs or their creation. Daniels then failed to appear for his Rule 2004 examination in June, 2010.

Most damningly, Daniels's motion seeking leave to transfer Plan assets to IRAs for tax compliance clearly implied that there were no IRAs yet. Indeed, that motion (the general gist of which was to explain that each Plan component had to be sold or changed in anticipation of retirement) falsely described the Plan's liquid "holdings" as "100% profit-sharing."

To be sure, a few facts arguably weigh in Daniels's favor. Daniels appears to be correct that he fully disclosed the total amount of money in both the Plan and the IRAs on his initial schedules, albeit listing all of the assets as part of the Plan. Therefore, this is not a case in which the debtor out-and-out hid the amount of his assets. Furthermore, disclosing the full amount up front rendered problematic any subsequent attempt to avoid accounting for and turning over the IRA assets should the Plan be found non-exempt.[19] Even so, we have explained before that bad faith may include conduct that is not, in fact, entirely in a

---

[19] Of course, because the listed assets included real estate, substantial changes in the value of the Plan might well be seen as changes in the value of the real estate, reducing the likelihood that the turnover of Plan assets valued at less than originally listed would trigger a hunt for other assets.

debtor's best interest.  See In re Hannigan, 409 F.3d 480, 483 (1st Cir. 2005).  And debtors must disclose even those assets they believe are unavailable to the bankruptcy estate.  In re Wood, 291 B.R. at 226 (citing In re Yonikus, 974 F.2d 901, 904 (7th Cir. 1992)).  As the Schedules' express instructions indicate, the "particulars" are indeed material; the form itself would be much shorter if only concerned with the amount, rather than the form and location, of assets.

It is also true that, in response to discovery requests in the adversary action regarding the Plan, Daniels did eventually turn over both the statements for the individual IRAs and a worksheet breaking down by name and account number the Plan components and Daniels's other IRAs.  All this shows, though, is that when the Trustee was conscientious enough to press again for detail, Daniels eventually became more forthcoming.[20]

Daniels also claims that he relied on the advice of his lawyer and accountant.  He points, though, to no affidavit from a lawyer or accountant who claims to have told him that he could omit mention of the IRAs.  More importantly, relying on the advice of one's fully-informed attorney in reporting assets may negate an inference of fraud or intentional concealment, but only if it is

---

[20]  As noted above, Daniels provided some evidence suggesting that he gave Agin statements for the IRAs in question at the 2009 creditors' meeting.  He did not, however, identify it in briefing or cite to it in his statement of facts, and so we need not consider it.  Fed. R. Civ. P. 56(c)(3).

not "transparently plain that the property [in question] should be scheduled." In re Mascolo, 505 F.2d 274, 277 & n.4 (1st Cir. 1974). Cf. In re Marrama, 445 F.3d at 523-24. Having created the IRAs in his own name only months before filing for bankruptcy, it should have been apparent to Daniels and any advisor that he must separately account for the IRAs and the Plan. Simply put, given that the form expressly requested the listing of IRAs, given that Daniels himself had recently created and funded the IRAs, and given that he knew he owned them, it is hard to conceive of any legitimate reason to decide not to list them.

Based on these facts, Daniels fails to create any reasonable basis for avoiding the conclusion that he acted, at best, with reckless disregard for the truth of the material information he supplied during his bankruptcy proceedings. Cf. In re Tully, 818 F.2d 106, 112 (1st Cir. 1987) (noting that "reckless indifference to" the truth is treated as the "functional equivalent of fraud for the purposes of [denying discharge to a debtor under 11 U.S.C.] § 727(a)(4)(A)."); In re Donahue, BAP NH 11-026, 2011 WL 6737074, at *11-14 (B.A.P. 1st Cir. Dec. 20, 2011) (affirming summary judgment denying a discharge under § 727(a)(4)(A) where debtors made misstatements and did not report a pre-petition property transfer or ongoing income therefrom, but denied intending to deceive anyone, had produced some relevant documents amidst hundreds of others, and blamed their omissions on counsel). The

-31-

few points arguably running in Daniels's favor simply cannot create a triable issue of fact in the face of the rather stunning imprecision and inaccuracy of Daniels's several statements regarding almost half of his assets. The amounts involved here render reckless errors that arguably may have been only negligent if they had concerned less significant items. We therefore affirm the bankruptcy court's entry of summary judgment on the issue of Daniels's intentional or reckless concealment.

## C. The Bankruptcy Court Did Not Abuse Its Discretion in Denying Daniels's Rule 60(b) Motion.

As noted above, in December, 2011, Daniels sought relief from the turnover judgment, claiming newly discovered evidence and excusable neglect. See Fed. R. Bankr. P. 9024; Fed. R. Civ. P. 60 (b)(1), (2). Essentially, he blamed his erroneous statements and filings on Atty. Cohen's ill health, arguing that he had given Cohen all of the relevant information. For support, Daniels offered a variety of documents, including affidavits claiming that he had not understood that Cohen was too sick to represent him effectively and that some of his requested changes to documents in the litigation were never made. As noted above, he offered a copy of his request for changes to his draft bankruptcy schedules, such as the addition of a rifle and $2,000 worth of wearing apparel and updating the IRAs and profit sharing plan information to match the Form 5500 and other unspecified "current info." Most of those changes were reflected in some form on the schedules that Daniels

-32-

signed.  Daniels also offered a fax to Cohen requesting changes to the draft March 15, 2010 motion, including a note that two IRAs had already been purchased.  The March 15, 2010 motion Daniels's counsel filed with the bankruptcy court did not reflect those changes.

After his motion was denied, Daniels sought reconsideration, and included (among other things) the email from Cohen to Daniels and his successor counsel, suggesting that successor counsel take over the case due to Cohen's health.  The motion was denied.  Two renewals of that motion, one purporting to explain the respective roles of Cohen and successor counsel in the summary judgment briefing, were similarly denied.

We review the denial of a Rule 60(b) motion for abuse of discretion, which amounts to "de novo review of strictly legal determinations and deference to the extent that the denial turns on factual or judgmental determinations." Capability Grp. v. Am. Exp. Travel Related Servs. Co. Inc., 658 F.3d 75, 79 (1st Cir. 2011). "[R]elief under Rule 60(b) is extraordinary in nature and motions invoking that rule should be granted sparingly." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 37 (1st Cir. 2013) (quoting Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir.2002)).

### 1.    Relief Was Not Warranted on "New Evidence" Grounds.

Relief under Rule 60(b)'s "new evidence" prong is appropriate where: "(1) new evidence has been discovered since the

[judgment]; (2) [it] could not by due diligence have been discovered earlier by the movant; (3) [it] is not merely cumulative or impeaching; and (4) [it] is of such a nature that it would probably change the result were a new trial to be granted." Morón-Barradas v. Dept. of Educ. of Com. of P.R., 488 F.3d 472, 482 (1st Cir. 2007) (quoting U.S. Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 52 (1st Cir.2002)). Where the evidence was available to the party before summary judgment, absent some convincing explanation, denying relief is not an abuse of discretion. Id.

We find nothing approaching an abuse of discretion in the bankruptcy court's rejection of Daniels's appeal to new evidence. As the court correctly noted, the proffered evidence had been available to Daniels and/or his successor counsel all along. Similarly, most of the evidence and argument offered in the subsequent motions for reconsideration were available before judgment was entered, and certainly when the first Rule 60(b) motion was filed. Furthermore, as the bankruptcy court noted, some of that evidence actually suggests that Daniels signed his schedules, knowing them to be inaccurate. We therefore affirm the bankruptcy court's refusal to relieve Daniels of the judgment based on his late-proffered evidence.

### 2. Relief Was Not Warranted on "Excusable Neglect" Grounds.

As used in Rule 60(b), "excusable neglect" can encompass ordinary negligence or carelessness.  See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 394-95 (1993). Whether relief is warranted is essentially an equitable inquiry, and takes into consideration all of the relevant circumstances. Cf. id. at 395 (discussing Fed. R. Bankr. P. 9006).  Particularly where a party failed to present available evidence before judgment, they must offer a "convincing" reason why their neglect should be excused.  Nansamba, 727 F.3d at 38-39.  "In civil cases, inadequate representation is normally a matter between the attorney and his client," but may justify Rule 60(b) relief in unusual cases. Capability Grp., 658 F.3d at 82.  "[A]t a minimum[, such a claim] would require both incompetent performance that the client could not have forestalled and a showing of likely prejudice."  Id.

The bankruptcy court noted that parties usually bear the burden of their attorneys' mistakes, and rejected Daniels's attempt to blame the finding of bad faith on Cohen's "excusable neglect" absent an explanation why successor counsel had not raised the issue at summary judgment.  Although the bankruptcy court might have justifiably reached the opposite conclusion, we see no abuse of discretion here.  Daniels's motion adequately explained neither his own failure to accurately discuss the IRAs despite many chances to do so, nor why his claim regarding Cohen's alleged failings was not made fully and clearly earlier.  Even assuming that Cohen was

seriously compromised, Daniels and his second lawyer knew that fact no later than March 11, 2011--when Cohen suggested withdrawing for medical reasons--well before the summary judgment response was filed in April.[21]  Therefore, even if Daniels could not readily have prevented the earlier missteps (which we need not decide) Daniels and successor counsel could readily have taken steps to forestall the extent to which those failings contributed to the bad-faith judgment.  There was no abuse of discretion, and we affirm the denial of Rule 60(b) relief.

## D.   The Bankruptcy Court Properly Granted Summary Judgment in the Revocation Action

Finally, Daniels appeals the bankruptcy court's grant of summary judgment to the U.S. Trustee in the revocation action. That judgment was based on the collateral estoppel effect of the bad faith holding in the turnover action.[22]  We review the application of collateral estoppel de novo.  See Keystone Shipping Co. v. New Eng. Power Co., 109 F.3d 46, 50 (1st Cir. 1997).  Because the initial judgment was that of a bankruptcy court applying federal

---

[21]  We also note that Cohen referenced his medical condition in the March 24, 2011 motion seeking more time for Daniels to respond to the summary judgment motion.

[22]  Although we affirmed the underlying summary judgment on the grounds of reckless disregard for the truth, rather than intentional bad faith, reckless disregard for the truth satisfies the scienter requirements for both of the grounds the U.S. Trustee cited for revoking Daniels's discharge.  See In re Tully, 818 F.2d 106, 111 (1st Cir. 1987) (reckless indifference satisfies 11 U.S.C. § 727(a)(4)(A)); In re Villani, 478 B.R. 51, 61 (B.A.P. 1st Cir. 2012) (reckless disregard can satisfy § 727(a)(2)).

law, the application of collateral estoppel is likewise governed by federal law.  <u>Monarch Life Ins. Co.</u> v. <u>Ropes & Gray</u>, 65 F.3d 973, 978 (1st Cir. 1995).  Collateral estoppel applies when:

> (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.

<u>Latin Am. Music Co. Inc.</u> v. <u>Media Power Grp., Inc.</u>,  705 F.3d 34, 42 (1st Cir. 2013) (quoting <u>Mercado-Salinas</u> v. <u>Bart Enters. Int'l, Ltd.</u>, 671 F.3d 12, 21-22 (1st Cir.2011)).

Daniels launches three attacks on that judgment:  (1) that the facts here cannot support a fraud-based revocation, because he only omitted immaterial information from his schedules, (2) that a debtor should not be denied a discharge where he relied on the advice of counsel in preparing his bankruptcy schedules, and (3) that collateral estoppel does not apply "as the issue here is not identical to the Bankruptcy Court's prior holding."

His first two objections are easy to dispatch; we have already explained, above, why Daniels's omissions and misstatements are material and why his claim of reliance on counsel fails.[23]  Nor can Daniels use the revocation action to force additional evidence of Cohen's alleged misfeasance into the record.  "Although changes

---

[23]    Daniels's cited cases do not help him as they do not consider the issue of collateral estoppel.

in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues, a party cannot circumvent the doctrine's preclusive effect merely by presenting additional evidence that was available to it at the time of the first action." Latin Am. Music Co., 705 F.3d at 42 (citations and internal quotation marks omitted).

Finally, Daniels has waived his third argument by failing to suggest how the two issues in the two proceedings differed. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (perfunctory claims are waived); Fed. R. App. P. 28(a)(9).

## IV. Conclusion

For the foregoing reasons, the judgments subject to this appeal are affirmed.