**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE FIRST CIRCUIT

———————————————

**BAP NO. MB 19-022**

———————————————

**Bankruptcy Case No. 14-14164-MSH**
**Adversary Proceeding 16-01163-MSH**

———————————————

**CONNOLLY GEANEY ABLITT & WILLARD, PC,**
**a/k/a ABLITT SCOFIELD, PC,**
**a/k/a ABLITT LAW OFFICES, PC,**
**a/k/a ABLITT & CHARLTON, PC,**
**Debtor.**

———————————————

**STEWART F. GROSSMAN, Chapter 7 Trustee,**
**Plaintiff-Appellee,**

**v.**

**DURHAM COMMERCIAL CAPITAL CORP. and**
**MAASAI HOLDINGS, LLC,**
**Defendants-Appellants.**

———————————————

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Hon. Joan N. Feeney, U.S. Bankruptcy Judge)**

———————————————

**Before**
**Cabán, Finkle, and Cary,**
**United States Bankruptcy Appellate Panel Judges.**

———————————————

**Victor G. Milione, Esq., and Lee Harrington, Esq., on brief for Defendants-Appellants.**
**David J. Reier, Esq., Adam J. Ruttenberg, Esq., and Nicholas J. Nesgos, Esq.,**
**on brief for Plaintiff-Appellee.**

———————————————

**April 7, 2020**

———————————————

**Finkle, U.S. Bankruptcy Appellate Panel Judge.**

Durham Commercial Capital Corp. ("Durham") and Maasai Holdings, LLC ("Maasai")[1]

appeal from: (1) the bankruptcy court's grant of summary judgment in favor of Stewart F.

Grossman, chapter 7 trustee (the "Trustee"), on the counts in his complaint to avoid and recover

fraudulent transfers under §§ 544(b), 548 and 550,[2] and Mass. Gen. Laws ch. 109A, §§ 5 and 6

(the "Summary Judgment Order"); and (2) the final judgment entered against them in the amount

of $1,342,487.31 (the "Judgment").  The Appellants assert that the bankruptcy court erred in

granting summary judgment because there were genuine issues of material fact which required a

trial, and abused its discretion in awarding the Trustee prejudgment interest at the Massachusetts

statutory rate.

For the reasons set forth below, we **AFFIRM** both orders.

## BACKGROUND

### I.       Pre-Bankruptcy Events

At the time of its bankruptcy filing, Connolly Geaney Ablitt & Willard, PC (the

"Debtor") was operating as a Massachusetts law firm under the name "Ablitt Scofield, P.C." at

property located in Woburn, Massachusetts (the "Property").[3]  The Debtor's primary business

was high-volume consumer home mortgage loan enforcement on behalf of national loan

servicers and financial institutions.

---

[1]  Durham and Maasai (collectively, the "Appellants") are under the common ownership and control of Craig McGrain.

[2]  Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.  All references to "Rule" are to the Federal Rules of Civil Procedure, and references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[3]  The Debtor's two principals are Steven Ablitt ("Ablitt") and Lawrence Scofield.  The Property was owned by a related entity, SAA Group, LLC ("SAA") which in turn was owned by Ablitt.

## A.  Debtor's Pre-Petition Obligations to DCR

Prior to the petition date, the Debtor was obligated to DCR Mortgage IV Sub III, LLC ("DCR") under a $1.5 million revolving line of credit note (the "DCR Note"), which was secured by a first priority lien on substantially all of the Debtor's assets, including accounts receivable. The Debtor was also a guarantor of SAA's obligations to DCR under a $4 million term note and a $560,000 promissory note. The two SAA notes were secured by senior mortgages on the Property. Through cross-guaranties and cross-collateralization agreements, the Debtor's guaranty of the SAA loans was also secured by the Debtor's accounts receivable.

## B.  The Debtor's Financial Problems

By the fall of 2012, the Debtor's financial situation was dire. All the loan obligations to DCR were in default, and the Debtor was operating under the terms of a forbearance agreement which expired in September 2012. SAA was also delinquent in real estate taxes, which further impaired DCR's secured collateral position. The Debtor was unlikely to survive loan enforcement action by DCR and needed working capital to continue its business.

### 1.  The Factoring Agreement[4]

In November 2012, the Debtor and Durham executed a "Nonrecourse Receivables Purchase Contract and Security Agreement" (the "Factoring Agreement"), setting forth terms

---

[4] "Factoring" is a type of debtor financing in which a business sells its accounts receivable to a third party (called a factor) at a discount. See Nickey Gregory Co. v. AgriCap, LLC, 597 F.3d 591, 601 (4th Cir. 2010) (citation omitted). This arrangement provides a company with access to immediate funds to pay its operating expenses. "Under the traditional form of such an agreement, the seller gives up the possibility of receiving the face value of the accounts receivable to have a discounted but unconditional sum certain in hand." Id. "The purchaser assumes the risk of collection, betting that its success in collecting on the accounts receivable will yield a return exceeding the discounted price it paid for the asset." Id.

under which the Debtor would sell accounts receivable to Durham at a discounted price. Among

other things, the Factoring Agreement required the Debtor to pay Durham an initial (and

thereafter annual) $12,000 "origination fee" for the credit facility, plus an additional fee of

3.25% of the face amount of each account receivable purchased.[5] On the date it purchased an

account receivable, Durham would pay part of the purchase price to the Debtor (referred to as an

"advance"), reserving from the total purchase price 35% of the face amount of each purchased

account receivable. Later it would pay the balance of the purchase price as a "rebate" after the

receivable was successfully collected. Under the agreement, pending collection of the full

amount of the receivable, Durham could elect to apply the "reserve" account against any

obligations the Debtor owed Durham. The Debtor also granted Durham a security interest in its

assets, including accounts receivable, and all proceeds thereof to secure any of its obligations

owed to Durham.

### 2. The February 7, 2013 Transactions

Because DCR's first priority security interest in the Debtor's accounts receivable would

have prevented the Debtor from selling any receivables to Durham under the Factoring

Agreement, on February 7, 2013, the Debtor, DCR, Durham, and Maasai executed several

additional instruments to facilitate the factoring arrangement as well as an assignment of the

DCR Note (collectively, the "February 7, 2013 Transactions"). These documents included:

(1) a loan sale contract under which DCR sold and assigned the $1.5 million DCR Note to

Maasai for the discounted price of $700,000; (2) a forbearance agreement among DCR, SAA, the

Debtor and Ablitt, providing for the release of the Debtor's accounts receivable from the

---

[5] The Factoring Agreement also provided that commencing on the 30th day following the date of purchase, an additional fee would be payable equal to 1.625% of the face amount of invoices for each 15-day period that Durham had not received payment of the face amount of the invoices.

collateral securing the Debtor's guaranty of the SAA notes and a reaffirmation of the Debtor's guaranty; and (4) a forbearance agreement among Maasai, the Debtor, and Ablitt, providing that the Debtor was not obligated to remit any payments to Maasai under the DCR Note for two years.

### C. The Property Transfers

#### 1. Collections on Unfactored Invoices of $198,100.33

Well before the February 7, 2013 Transactions, in December 2012, Durham informed two of the Debtor's clients that the Debtor's accounts had been "assigned" to Durham and that all payments of the Debtor's invoices should be made directly to Durham. At the time, Durham had not yet purchased any accounts receivable from the Debtor—in fact no accounts were factored until February 7, 2013.[6] Nonetheless, between January 14 and February 4, 2013, Durham collected payments totaling $198,100.33 from these clients (the "Unfactored Invoices"), but it never advanced any funds to the Debtor as payment for these Unfactored Invoices.

In her expert report, Penelope Bley, a forensic analyst employed by the Trustee in connection with the adversary proceeding, described the transfers relating to the Unfactored Invoices:

> The Unfactored Collections Report shows that between January 14 and February 4, 2013, Durham reported collecting $198,100.33 on account of the Debtor's invoices ("Unfactored Invoices"). No invoices were factored prior to February 7, 2013. Yet, Durham started collecting invoices before any invoices were actually sold to Durham and before Durham made any cash advances to the Debtor. In its answers to interrogatories, Durham has never contended that any of the Unfactored Invoices were ever sold to Durham. Durham has never produced any evidence that it purchased such invoices, such as, an Account Purchase Addendum, which was a form Durham used to document the purchase and sale of specific invoices. Based on my review of the accounting records, Durham never remitted any of the $198,100.33 to the Debtor.

---

[6] As noted, the Debtor's accounts receivable could not be factored prior to February 7, 2013 because they remained subject to DCR's security interest until the DCR Note was sold to Maasai.

## 2.  $200,000 Cash Transfer

On February 7, 2013, the Debtor sent by wire transfer $200,000 to Durham.  The record reflects that the funds came from the Debtor's collection on a sizeable invoice for legal services provided to JPMorgan Chase.  That invoice had not been sold to Durham and Durham did not at any time return the $200,000 to the Debtor.  Ms. Bley in her expert report concluded that no consideration was provided to the Debtor in exchange for such funds.  She explained:

> On February 7, 2013, the Debtor transferred $200,000 in cash to Durham.  The transfer is confirmed by or through multiple sources, including emails, invoice records, and bank statements.  On January 17, 2013, the Debtor invoiced its client JPMorgan Chase $439,750.00.  Accounting records and emails that were attached to the Trustee's opposition to Maasai's motion for summary judgment show that on February 6, 2013, the Debtor received a payment of the invoice from JPMorgan in the amount of $439,750.00.  The following day, the Debtor made an outgoing wire transfer of $200,000.  On the same day, the Debtor forwarded the wire confirmation to Craig McGrain, thus confirming that it had wired $200,000 to Durham's bank account, Account No. ending 7368.  In its answers to interrogatories, Durham admits having received the $200,000 cash transfer.

> Thus, as of February 7, 2013, Durham was in possession of $398,100.33 of the Debtor's money, $198,100.33 representing collections of Unfactored Invoices, and $200,000 cash (representing $200,000 of the $439,750 the Debtor had just collected from its client JPMorgan Chase).  Further, as of such date, no consideration of any kind or nature whatsoever had been provided to the Debtor in exchange for such funds.

## 3.  Sale of Factored Invoices with a Face Value of $951,719.81

Also on February 7, 2013, the Debtor sold to Durham hundreds of invoices under the Factoring Agreement having an aggregate face value of $951,719.81 (collectively, the "Factored Invoices").  These sales were documented by "Account Purchase Addenda" identifying each invoice the Debtor was "sell[ing] and assign[ing]" to Durham.  According to Durham's records, it "advanced" $626,699.15 to the Debtor towards the purchase price of the Factored Invoices.

Thereafter, Durham collected $894,403.88 on account of the Factored Invoices. Durham's accounting records show, however, that the only amount Durham ever paid to the

6

Debtor to purchase the Factored Invoices was $235,366.46. In reality then, on the date it purchased the Factored Invoices, Durham did not actually advance $626,699.15 to the Debtor, nor did it pay such funds any time thereafter. Ms. Bley opined in her report:

> At no time did the Debtor ever actually receive from Durham any of the $626,699.15 that was purportedly advanced. The Durham Accounting shows all of the advances made by Durham to the Debtor after February 7, 2013. I have reconciled all the advances against the Debtor's QuickBooks files to verify that the advances shown in the Durham Accounting (other than the $626,699.15) were in fact advanced to the Debtor. Significantly, the Durham Accounting links every advance to a specific invoice such that each advance made to the Debtor after February 7, 2013 was in exchange for one or more invoices sold and assigned to Durham under the Factoring Agreement. From this fact it follows and it is my opinion that none of the $626,699.15 was ever subsequently advanced to the Debtor. . . .
>
> Thus, the Durham Accounting shows that of the invoices assigned to Durham on February 7, 2013, Durham collected $894,403.88. Since Durham never actually transferred the amount shown as having been "advanced", the only amount that the Debtor ever received for such invoices was $235,366.46.

### 4. Total Value of Transfers Made by the Debtor to Durham

The total value of the transfers (collectively, the "Transfers") made by the Debtor to Durham was $1,024,799.48, consisting of: (1) $198,100.33 in collections on the Unfactored Invoices; (2) $200,000 cash transfer on February 7, 2013; and (3) $626,699.15 of the purchase price for the Factored Invoices that was purportedly, but not actually, paid to the Debtor.

### D. Durham's Use of the Debtor's Funds

The Account Purchase Addenda for the sale of the Factored Invoices were part of an attachment to a February 7, 2013 email ("Email Attachment") from Durham to the Debtor. In the email, Durham requested that the Debtor execute the "attached funding documents," and stated that "[u]pon receipt of these and the final closing documents we will wire the funds to DCR to purchase the loan."

The final page of the Email Attachment showed how funds received or due the Debtor were to be used. It identified "Total Rebates Due" of $398,100.33 (consisting of the $198,100.33 in collections on the Unfactored Invoices and the Debtor's $200,000 cash transfer), "Other Charges" of $1,024.799.48 (reflecting the total value of the Transfers), and a "Net Check" in the negative amount of $626,699.15 (the amount of the unpaid advance on the Factored Invoices). It also provided further itemization under the heading "Other Charges," listing several items totaling $1,024,799.48, broken down as $700,000.00 for the purchase of the DCR Note; $161,712.46 for "DCR Tax/Utilities"; $42,713.19 for "DCR Misc Fees"; $59,514.17 for DCR's counsel Holland & Knight for legal fees; $40,455.19 for Durham's legal fees; and $20,404.47 for various other fees charged under the Factoring Agreement.

On February 7, 2013, the same day Maasai purchased the DCR Note from DCR, Durham transferred $963,989.82 to Maasai by "teller transfer." Between February 7 and 8, 2013, Maasai wired a total of $963,964.82 to DCR and DCR's counsel Holland & Knight. These funds equaled the amount required to purchase the DCR Note, consisting of the stated purchase price of $700,000, taxes and utilities owed by SAA of $161,712.46, legal fees owed to Holland & Knight of $59,514.17, DCR "miscellaneous fees" of $42,713.19, and a "Wire transfer fee to DCR" of $25.00. Each of those amounts corresponded with the figures listed in the final page of the Email Attachment.

## II.    The Bankruptcy Filing

On September 3, 2014, several creditors filed an involuntary chapter 7 petition against the Debtor. The bankruptcy court entered an order for relief on October 16, 2014, and the Trustee was appointed a few days later.

8

### III. The Adversary Proceeding

#### A. The Complaint

The Trustee filed a five-count complaint against the Appellants, seeking to avoid the Transfers under § 548, § 544(b), and Mass. Gen. Laws ch. 109, §§ 5 and 6 (Counts I and II), and to recover the value of the avoided Transfers under § 550 (Count III) (collectively, the "Fraudulent Transfer Claims"). Subsequently, the two remaining counts of the complaint were dismissed and are not at issue in this appeal.

#### B. Trustee's Summary Judgment Motion and Appellants' Opposition

The Trustee filed a motion seeking partial summary judgment on the Fraudulent Transfer Claims (the "Summary Judgment Motion").[7] The Trustee argued he was entitled to avoid the Transfers as a matter of law as the undisputed material facts established: (1) the Transfers were of the Debtor's property; (2) the Transfers occurred within two years of the petition date; (3) the Debtor received less than reasonably equivalent value in exchange for the Transfers; and (4) the Debtor was insolvent when the Transfers were made. He also argued he was entitled to recover the value of the avoided Transfers under § 550 from both Durham and Maasai because the Transfers were initially made to Durham and were for the benefit of Maasai.

Not surprising, the Appellants opposed the Summary Judgment Motion (the "Opposition"). They contended the Trustee had failed to articulate facts sufficient to support causes of action for avoiding the Transfers because: (1) the Debtor received "direct value" for the Transfers; and (2) the Appellants were entitled to take control and possession of the accounts

---

[7] The Trustee also submitted a Concise Statement of Material Facts and an affidavit of his counsel with references to expert reports prepared by: Penelope Bley about transfers made by the Debtor to Durham and what, if anything, the Debtor received in exchange for such transfers; Richard A. Clarke on whether the Debtor received reasonably equivalent value for the transfers; and Craig R. Jalbert on the Debtor's insolvency at the time the transfers were made.

receivable as their collateral and, therefore, no "transfers" occurred. To support their

Opposition, the Appellants submitted an affidavit of Durham's president Craig McGrain.[8] They

did not, however, file a statement of disputed material facts as required by Local Rule 56.1 of

U.S. District Court for the District of Massachusetts ("Local Rule 56.1").[9] Most significantly,

they did not submit any expert reports to rebut the reports of the Trustee's experts.

To counter this Opposition, the Trustee argued his Statement of Material Facts "should be

taken as admitted," in light of the Appellants' failure to submit a statement of disputed material

facts as required by Local Rule 56.1, or otherwise to identify "any facts supported by admissible

evidence establishing the existence of genuine issues of material fact precluding summary

judgment."

## C. The January 9, 2019 Hearing

### 1. Trustee's Arguments

The bankruptcy court held a hearing on January 9, 2019 on the Summary Judgment

Motion. The Trustee argued he had met his burden of demonstrating there were no genuine

issues of material fact and that he was entitled to judgment as a matter of law on his Fraudulent

Transfer Claims. He identified the Transfers of the Debtor's property to Durham and asserted

there was no genuine dispute that these transfers actually occurred and that the Appellants had

---

[8] In his affidavit, Mr. McGrain averred that the accounts receivable transferred to Durham and their proceeds "were held as collateral" by Maasai to secure the Debtor's obligations on the DCR Note and, therefore, there were "no transfers subject to avoidance and recovery on a fraudulent transfer theory . . . ." He also stated the Debtor had received "direct, equivalent value" for the Transfers in the form of: $263,989 paid to third parties for taxes, utilities, legal fees and other related closing costs; elimination of the entire balance of the DCR Note from the Debtor's balance sheet after Maasai purchased the DCR Note; the release of over $5 million in debt against the Debtor's assets, enabling the Debtor to have "liquidity to operate"; the release of "cross-collateralization obligations guaranteed by the [Debtor]"; and a two-year forbearance on payments to Maasai.

[9] For a discussion of Local Rule 56.1 and its requirements, see infra at 21-22.

offered nothing to rebut Ms. Bley's expert report and her conclusions about the transfers. He also argued there was no genuine dispute that the Debtor was insolvent at the time of the Transfers as demonstrated through the expert report of forensic accountant Craig Jalbert. The Appellants, he asserted, offered no rebuttal to counter the facts or expert opinions stated in the report.

Additionally, the Trustee maintained he had established that the consideration the Debtor received in exchange for the Transfers was not reasonably equivalent to the value of the property that was transferred. According to the Trustee, the sole consideration the Appellants identified the Debtor to have received in exchange for the Transfers was "access to capital," effectuated through the Factoring Agreement with Durham. But this consideration, as opined by Mr. Clarke in his expert report, had "no quantifiable value." Moreover, the Appellants, he noted, had not presented any expert opinion or other evidence that this "access to capital" had any quantifiable value. Nor had they presented any contrary expert opinion or other evidence to indicate what that value might be.

Lastly, the Trustee contended he was entitled to recover the value of the Transfers from both Durham, as the initial transferee, and Maasai, as the entity for whose benefit the transfers were made. He emphasized the "unrebutted" evidence that Durham received property of the Debtor totaling $1,024,799.48 and, in turn, transferred $963,989.82 to Maasai, who used the funds to purchase the DCR Note.

### 2. Appellants' Opposition

Challenging the Trustee, the Appellants argued that the Debtor received reasonably equivalent value for the Transfers in the form of: (1) $682,000 in "settlement income" attributable to the Debtor's "discounted obligation" under the DCR Note; (2) Maasai's

agreement to forego payments on the DCR Note for two years; and (3) relief from its secured obligations as a guarantor on the SAA Obligations, thereby "unbuckling [ ] that guarantee to free up their receivables." The Appellants conceded, however, that they had not submitted any expert reports or other evidence to support their contentions or to refute the reports submitted by the Trustee. Also, the Appellants did not provide the court with a valuation figure as Mr. McGrain did not quantify the value allegedly provided to the Debtor during his deposition.

Moreover, the Appellants maintained that the collections they received from the Debtor's accounts receivable constituted Durham's collateral which it was entitled to retain. According to the Appellants: "Durham took the paper, transferred cash to Maasai to purchase the note" and then "painstakingly over time collected those receivables." Those funds collected on the accounts receivable were then "held as collateral pursuant to the security agreement" to secure the Debtor's future obligations.

### 3. Trustee's Response to Appellants' Arguments

To counter the Appellants' arguments, the Trustee responded that the monies collected on the accounts receivable did not constitute Durham's collateral; rather there was "an outright assignment" or sale of the receivables. He argued that "[t]he proceeds from the collection of receivables belong to Durham. Durham is buying [sic] the receivables. . . . Durham is advancing money, is paying for those receivables. . . . [T]hat's the nature of a factoring agreement. That's what it means." Further, he contended there was no evidence the Debtor received $682,000 of debt relief on account of the sale of the DCR Note to Maasai at a discounted price.

**D.** **The Summary Judgment Order**

On February 27, 2019, the bankruptcy court entered the Summary Judgment Order granting summary judgment in favor of the Trustee on the Fraudulent Transfer Claims.

In its written decision, the bankruptcy court found that the Appellants failed to submit a statement of disputed material facts as required by Local Rule 56.1, and consequently, the material facts set forth in the Trustee's Statement of Facts were "deemed admitted." The court then concluded that those undisputed facts presented the requisite elements for avoidance of the fraudulent transfers. Specifically, the court determined that while the Debtor was insolvent, it transferred sums totaling $1,024,799.48 to Durham, for which the Debtor did not receive reasonably equivalent value in exchange. The bankruptcy court rejected the Appellants' position that there had not been any "transfers" as the property constituted collateral under the financing transactions that they were entitled to retain. The argument, the court explained, could "not be reconciled with the Factoring Agreement and the Forbearance Agreement." Finally, the court found that Durham provided the Debtor's funds to Maasai to acquire the DCR Note and, therefore, the Trustee was entitled to recover the value of the transferred property from both Durham and Maasai under § 550(a)(1).

**E.** **Appellants' Reconsideration Motion**

On March 13, 2019, the Appellants filed a motion seeking reconsideration of the Summary Judgment Order (the "Reconsideration Motion"). They argued that the bankruptcy court had erred in relying on material facts that were in dispute, and asked the court to vacate the Summary Judgment Order and allow the matter to proceed to a full trial on the merits.

13

**F.      Final Judgment Motion and Appellants' Opposition**

That same day the Trustee filed a motion (the "Final Judgment Motion") seeking: (1) dismissal of the sole remaining count of the complaint after the summary judgment proceedings; (2) entry of final judgment on the Fraudulent Transfer Claims; and (3) an award of prejudgment interest at the statutory rate of 12% as provided under Mass. Gen. Laws ch. 231, §6C, which the Trustee calculated to be $317,687.83.

The Appellants opposed the Final Judgment Motion, and also challenged the Trustee's request for prejudgment interest at the state statutory interest rate.

**G.      Order Denying Reconsideration Motion**

The bankruptcy court held a hearing on the Reconsideration Motion on March 27, 2019. At the hearing, the Appellants argued they had demonstrated there were genuine issues of material fact which they had specifically set forth in a statement of facts included in their Summary Judgment Opposition.  These, they contended, related to key factual issues: the amount of the Transfers and whether the Debtor received reasonably equivalent value for the Transfers. The Trustee countered that the Appellants were simply rehashing arguments previously made during the summary judgment proceedings, and the record was devoid of evidence to support their alternative theories of reasonably equivalent value.

> After hearing arguments from the parties, the bankruptcy court concluded:
>
> First of all, with respect to Rule 56.1, the [Appellants] contend[ ] that [they] essentially complied with the district court rule which is incorporated into the local rules for the bankruptcy court in [t]his district.  I think that the [Appellants] should have filed a separate statement of facts as to which there were dispute[s], but I accept [their] argument that in the absence of a plain, express requirement of a separate document, such is not required, and essential compliance is compliance.
>
> However, in reviewing the entire summary judgment record, including the voluminous submissions by the [Appellants], the [Appellants] did not point out

those facts as to which there were disputes and rebut the evidence proffered by the trustee-plaintiff in this case.

The court also dismissed the Appellants' other arguments, concluding they were either being presented for the first time in the Reconsideration Motion or simply restated arguments previously made. After the hearing, the bankruptcy court entered an order denying the Reconsideration Motion.

### H. Final Judgment

On March 29, 2019, the bankruptcy court entered the Judgment in favor of the Trustee and against (1) Durham, avoiding the Transfers under § 548, § 544(b), and Mass. Gen. Laws ch. 109A, §§ 5 and 6; and (2) both Durham and Maasai, for recovery by the Trustee of $1,342,487.31.[10]

### I. Emergency Motion to Vacate Judgment and Trustee's Opposition

The Appellants filed an emergency motion seeking to vacate the Judgment and schedule the Final Judgment Motion for a "formal hearing" on the limited issue of the Trustee's entitlement to prejudgment interest at the state statutory rate. The Trustee opposed the motion, pressing that a hearing was unnecessary as his entitlement to prejudgment interest at this rate "was based on the law, not on the facts."

In a preliminary order dated April 1, 2019, the bankruptcy court denied the Appellants' request for oral argument on the Final Judgment Motion and directed them to brief the prejudgment interest issue. In their brief, the Appellants asserted that the amount of prejudgment interest awarded to the Trustee was punitive and the court should reduce it to an amount that fairly compensated the estate for the interest it might have earned during the period from demand

---

[10] This figure is the amount of the underlying award of $1,024,799.48, plus $317,687.83 in prejudgment interest.

to judgment. They posited that this amount was actually in the range of $1,500 to $20,000. Alternatively, they urged the court to apply the federal rate of 2.42% as a more appropriate interest rate.

### J. Order Denying Motion to Vacate Judgment

On April 8, 2019, the bankruptcy court denied the Appellants' request to vacate the Judgment. The court determined that as the Trustee had raised parallel federal and state claims and had prevailed on both such claims, he was entitled to prejudgment interest at the 12% rate provided in Mass. Gen. Laws ch. 231, § 6B. The court also found that although the prejudgment interest figure accounted for one-third of the Trustee's total recovery, that amount was not unreasonable considering it took two and a half years for the litigation to conclude. Accordingly, the court sustained its award of $317,687.83 in prejudgment interest.

## POSITIONS OF THE PARTIES ON APPEAL

### I. The Appellants

The Appellants argue the Summary Judgment Order should be reversed because the statement of facts set forth in their Opposition to the Summary Judgment Motion satisfied Local Rule 56.1 and, therefore, they were "entitled to a full and fair trial" on the disputed issues. In particular, the bankruptcy court erred in: (1) determining there were actual "transfers"; (2) concluding the Debtor did not receive reasonably equivalent value for the Transfers; and (3) awarding the Trustee prejudgment interest at the state statutory rate.

First, the Appellants maintain there were no real "transfers" of the Debtor's property which the Trustee could avoid under a fraudulent transfer theory. Because they held valid, perfected security interests in all of the Debtor's accounts receivable, they assert that the

16

"proceeds" of any receivables transferred under the Factoring Agreement (monies collected) constituted collateral which they were entitled to retain.

Second, the Appellants contend that the question of whether the Debtor received reasonably equivalent value is a disputed, material factual issue that should be resolved at trial. According to the Appellants, not only did the Debtor gain "access to capital" by virtue of the February 7, 2013 Transactions, it also received "direct, equivalent value" for the Transfers. Such value consisted of: (1) the removal from the Debtor's balance sheet of the indebtedness of $1,362,822.21 due on the DCR Note after Maasai purchased the DCR Note at the discounted price of $700,000, resulting in the Debtor receiving a $662,822 reduction on the DCR Note; (2) the Debtor's relief from significant obligations to DCR by the release of the cross-collateralized guarantee obligations of the Debtor, the release of the SAA mortgages, and DCR's forbearance from exercising rights under loan obligations not sold to Maasai; and (3) the payment of $263,989 (of the $963,989 transferred by the Debtor to Durham under the Factoring Agreement) to third parties for taxes, utilities, legal fees and other related costs, as well as "legal fees and factoring fees" to which Durham was entitled under the Factoring Agreement.

Third, the Appellants maintain that the bankruptcy court abused its discretion in awarding the Trustee prejudgment interest at the rate of 12% under Massachusetts law. According to them, the bankruptcy court should have exercised its discretion to award prejudgment interest "at a rate that fairly compensates the estate for the interest it might otherwise have earned." They argue that any award of prejudgment interest should have been in an amount that accurately reflected the actual economic loss suffered by the estate, a significantly lower sum between $1,500 and $20,000.

**II.    The Trustee**

The Trustee refutes the Appellants' contentions of trialworthy factual disputes. By failing to submit a separate statement of disputed material facts as required by Local Rule 56.1, the Appellants failed to demonstrate the existence of any genuine issues of material fact to preclude summary judgment. The bankruptcy court, he maintains, did not err in deeming the Trustee's Statement of Facts as admitted.

He also argues Appellants failed to establish a genuine disputed factual issue as to whether the accounts receivable and their proceeds were held as collateral to secure the Debtor's obligations to Maasai under the DCR Note. He notes that simply because a lender has a security interest in certain property, it does not follow that any and every transfer of such property to the lender is for collateral purposes. Moreover, the Appellants offered no evidence of any agreement between the Debtor and Durham that the Transfers were intended to be held as collateral for future advances or that any of the Transfers were applied in satisfaction of any future indebtedness.

Additionally, the Trustee contends that the Appellants failed to prove a triable issue as to the element of reasonably equivalent value. The Appellants did not question the admissibility of the Trustee's expert on this element and did not proffer any value expert of their own. He also argues the bankruptcy court correctly rejected the Appellants' argument that the Debtor received value in the form of a reduction of the DCR Note balance and the use of funds to pay various obligations of the Debtor's affiliate, SAA.

Lastly, the Trustee argues that First Circuit law supports the award of prejudgment interest at the state statutory rate where a litigant prevails on state law claims. Thus, the bankruptcy court did not abuse its discretion in the amount of the prejudgment interest award.

18

## APPELLATE JURISDICTION

The Panel has jurisdiction to consider appeals from final judgments and orders of the bankruptcy court. Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998) (citing 28 U.S.C. § 158(a)(1)); see also Ritzen Grp., Inc. v. Jackson Masonry, LLC, 140 S. Ct. 582, 587 (2020); Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1692 (2015). Generally, an order granting summary judgment is a final, appealable order. Bullard, 135 S. Ct. at 1694; see also Encanto Rests., Inc. v. Aquino Vidal (In re Cousins Int'l Food, Corp.), 565 B.R. 450, 458 (B.A.P. 1st Cir. 2017) ("An order granting summary judgment is a final order where no counts against any defendants remain.") (citation omitted). Here, the bankruptcy court granted summary judgment on the Fraudulent Transfer Claims, dismissed the remaining counts of the complaint, and entered a final judgment. Therefore, the orders before us are final and we have jurisdiction to hear this appeal.

## STANDARD OF REVIEW

"On appeal, both the grant of summary judgment and the determination that there are no issues of material fact in dispute are reviewed *de novo*." Segarra Miranda v. Garrido Pagan (In re Garrido Jimenez), 370 B.R. 878, 880 (B.A.P. 1st Cir. 2007) (citing Guzman-Rosario v. United Parcel Serv., Inc., 397 F.3d 6, 9 (1st Cir. 2005); Canzano v. Ragosa (In re Colarusso), 382 F.3d 51, 57-58 (1st Cir. 2004)). A bankruptcy court's award of prejudgment interest is reviewed for abuse of discretion, but whether state or federal law applies to determine the amount and availability of prejudgment interest is reviewed *de novo*. See Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co., 513 F.3d 949, 954 (9th Cir. 2008); see also Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 69 (1st Cir. 2019); Lassman v. Keefe (In re Keefe), 401 B.R. 520, 524, 526 (B.A.P. 1st Cir. 2009).

## DISCUSSION

### I. The Applicable Standards

#### A. The Summary Judgment Standard

##### 1. Rule 56

Summary judgment is governed by Rule 56, which is applicable to adversary proceedings by Bankruptcy Rule 7056. Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 762 (1st Cir. 1994); see also Soto-Rios v. Banco Popular de P.R., 662 F.3d 112, 115 (1st Cir. 2011). Rule 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Daniels v. Agin, 736 F.3d 70, 78 (1st Cir. 2013); Magríz-Marrero v. Unión de Tronquistas de P.R., Local 901, 933 F. Supp. 2d 234, 245 (D.P.R. 2013) ("[T]he moving party bears a two-fold burden: it must show that there is 'no genuine issue as to any material facts;' as well as that it is 'entitled to judgment as a matter of law.'"). The party moving for summary judgment has the initial burden of demonstrating "there is no genuine issue of material fact which requires resolution in the crucible of a trial." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997); see also Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 66 (1st Cir. 2004) (citations omitted). In meeting this burden, the movant "ordinarily must support the motion with affidavits or other materials of evidentiary quality." Fed. Refinance Co. v. Klock, 352 F.3d 16, 30 (1st Cir. 2003) (citing Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002)).

Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to "produce 'specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" Brooks v. AIG SunAmerica Life

20

Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (quoting Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted). A party asserting that a fact is genuinely disputed "must support the assertion by [ ] citing to . . . materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). If a party fails to properly contest another party's assertion of fact or to support that contest with citations to the record as required by Rule 56(c), the court may, among other things, "consider the fact undisputed for purposes of the motion[,]" Fed. R. Civ. P. 56(e)(2), or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3).

### 2. Local Rule 56.1

Local Rule 56.1, which is made applicable to adversary proceedings by MLBR 7056-1, also comes into play here. It provides: "Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." L.R. D. Mass. 56.1. It requires a party opposing summary judgment to include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Id.; see also Daniels, 736 F.3d at 73.

This local rule sets forth the consequences when an opposing party fails to comply with its requirements: "Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties

21

unless controverted by the statement required to be served by opposing parties." L.R. D. Mass. 56.1. Thus, if a party opposing summary judgment fails to act in accordance with the rule, the court must accept the moving party's facts as stated in its statement of uncontested facts. See United States v. Parcel of Land & Residence at 18 Oakwood St., Dorchester, Mass., 958 F.2d 1, 5 (1st Cir. 1992) (stating that omission of statement of disputed facts has "the legal effect of admitt[ing] [the moving party's] factual assertions") (citation omitted).

## B. Standards Governing Avoidance and Recovery of Fraudulent Transfers

### 1. Avoidance Under § 548(a)

Section 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . . .
>   (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
>   (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B)(i) & (ii)(I).

To prevail under § 548(a), a trustee must prove these elements by a preponderance of the evidence: (1) "the transfer in question was of an interest of the debtor in property"; (2) "the transfer occurred on or within 2 years of the date of the filing of the petition"; (3) "the debtor received less than a reasonably equivalent value in exchange for the transfer"; and (4) "the debtor was insolvent on the date that such transfer was made or became insolvent as a result of the transfer." Braunstein v. Crawford (In re Crawford), 454 B.R. 262, 271 (Bankr. D. Mass. 2011) (citation omitted).

**2. Avoidance Under § 544(b) and the Massachusetts Uniform Fraudulent Transfer Act**

Section 544(b)(1) authorizes the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [state] law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b). Bankruptcy trustees use § 544(b) "as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy." ASARCO LLC v. Americas Mining Corp., 404 B.R. 150, 156 (S.D. Tex. 2009); see also In re DeGiacomo v. Sacred Heart Univ., Inc. (In re Palladino), 942 F.3d 55, 58 n.2 (1st Cir. 2019) (stating that, under § 544(a), the bankruptcy trustee may exercise the rights of creditors under state fraudulent transfer laws and avoid transfers that violate Mass. Gen. Laws ch. 109A, §§ 5(a) and 6(a)).

The Massachusetts Uniform Fraudulent Transfer Act, Mass. Gen. Laws ch. 109A, §§ 1, et seq. ("MUFTA"), is the applicable state law in this case. MUFTA § 6(a) provides in pertinent part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws ch. 109A, § 6(a). The four requisite elements for relief under this statute are: "(1) that a transfer occurred; (2) at a time when a creditor was in existence; (3) that the Debtor did not receive reasonably equivalent value for the transfer; and (4) that the Debtor was insolvent at the time of the transfer or rendered insolvent by the transfer." Desmond v. Chiang (In re Chiang), 562 B.R. 559, 571 (Bankr. D. Mass. 2016). With a few exceptions not relevant here,

23

the provisions of MUFTA § 6(a) "essentially parallel" § 548 of the Bankruptcy Code.  Lassman v. Burgess Constr. Servs., Inc. (In re Sears Petroleum & Transp. Corp.), 417 F. Supp. 2d 212, 222 (D. Mass. 2006) (citation omitted); see also Riley v. Countrywide Homes, Inc. (In re Duplication Mgmt., Inc.), 501 B.R. 462, 481 (Bankr. D. Mass. 2013) ("In many respects, the Massachusetts UFTA § 6(a) mirrors Bankruptcy Code § 548(a)(1)(B).") (citations omitted).  As with § 548 avoidance actions, the trustee carries the burden of proving each element under MUFTA § 6(a) by a preponderance of the evidence.  See Lassman v. Reilly (In re Feeley), 429 B.R. 56, 62 (Bankr. D. Mass. 2010).

### 3.  Recovery of Avoided Transfers Under § 550

Once the trustee has successfully avoided a fraudulent transfer under either § 548(a) or § 544(b), the trustee may recover the value of the fraudulently transferred property from "the initial transferee" or any "entity for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1).

## II.     Applying the Standards

### A.     The Bankruptcy Court Did Not Err in Determining There Were No Genuine Issues of Material Fact

The Trustee satisfied his initial burden to show no genuine issues of material fact by submitting a statement of facts supported by references to three expert reports, as well as to documents and deposition testimony, all of which were submitted as part of the summary judgment record.  The burden then shifted to the Appellants to identify the material facts they contended were in dispute, with citations to record evidence establishing the existence of a dispute.  See L.R. D. Mass. 56.1; Daniels, 736 F.3d at 73.

The Appellants did not file a separate statement identifying the material facts they insisted were subject to dispute.  Rather, in their Opposition to the Summary Judgment Motion

24

they included their own statement of facts in numbered paragraphs under the heading "Statement of Material Facts." They argue that this satisfied Local Rule 56.1, which does not mandate the filing of a *separate* statement of facts. They also argue they "amply communicated" their disagreement with the Trustee's statement of facts in the argument section of their Opposition.

Despite the inclusion of these numbered paragraphs and their "communication" of disputed facts, we conclude that the Appellants did not meet their burden under Local Rule 56.1. The Appellants did not identify any of the paragraphs included in their "Statement of Material Facts" section as facts as to which they contended a genuine dispute existed, nor did they rebut any of the Trustee's own statement of material facts. Moreover, most of the paragraphs failed to reference the evidentiary record and many of them consisted of argument rather than facts, let alone facts supported by the record. The Appellants also attempted to introduce other new and disputed facts for the first time in the argument section of their Opposition, rather than in their statement of material facts. In doing so they ignored the requirement in Local Rule 56.1 to state clearly and concisely the facts claimed to be in dispute and the record evidence supporting those claims.

The First Circuit explained the importance of local rules, addressing in particular local rules governing summary judgment procedures:

> [S]uch rules were inaugurated in response to this court's abiding concern that, without them, "summary judgment practice could too easily become a game of cat-and-mouse." Such rules are designed to function as a means of "focusing a district court's attention on what is—and what is not—genuinely controverted." . . .
>
> Given the vital purpose that such rules serve, litigants ignore them at their peril. In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a [ ] court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated.

> . . . [P]arties are required to straightforwardly comply with the dictates of local rules such as Local Rule 56, and to state clearly and concisely the facts claimed to be undisputed or disputed, or qualified, and the record evidence supporting those claims. . . . Local Rule 56 is intended to prevent parties from shifting to the [ ] court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material. . . . Should the Court excuse this blatant non-compliance, the [ ] court would be forced to "grope unaided for factual needles in a documentary haystack."

Ríos-Jiménez v. Principi, 520 F.3d 31, 38-39 (1st Cir. 2008) (citations omitted) (internal quotation marks omitted). In short, an opposing party who ignores the requirements of a local rule such as Local Rule 56.1 bears "the onus of that neglect." Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000). Although an opposing party's failure to file a separate statement of disputed facts with specific citations to the record "does not automatically warrant the granting of summary judgment, [ ] 'it launches the nonmovant's case down the road toward easy dismissal.'" Mateo-Espada v. Puerto Rico, No. Civ. 02-2603 (SEC), 2005 WL 1640485, at *1 (D.P.R. June 30, 2005) (citation omitted) (discussing similar local rule); cf. Ruiz Rivera, 209 F.3d at 28 (holding that opposing parties' "brazen disregard" of analogous local rule constituted "an independently sufficient ground for affirmance of the judgment below"). "The court is not required to ferret through the record in search of evidence supporting [the nonmovants'] case." Mateo-Espada, 2005 WL 1640485, at *1 (citation omitted).

Here, in the absence of clearly identified disputed facts or a point-by-point rebuttal of the Trustee's stated facts, with adequate references to the evidentiary record to show the existence of a material dispute, the Appellants essentially placed the burden on the Trustee and the court to comb through their Opposition to ascertain what specific facts they contested and what evidence they relied upon to support those facts. This is precisely what Local Rule 56.1 proscribes. See Ríos-Jiménez, 520 F.3d at 39.

26

On appeal, the Appellants assert that the bankruptcy court "ultimately ruled that the Appellants had complied with the rule." But they take out of context the bankruptcy court's statement at the hearing on the Reconsideration Motion that "in the absence of a plain, express requirement of a separate document, such is not required, and essential compliance is compliance." And they ignore the entirety of the bankruptcy court's ruling:

> I think that the defendants should have filed a separate statement of facts as to which there were dispute, but I accept its argument that in the absence of a plain, express requirement of a separate document, such is not required, and essential compliance is compliance.
>
> *However, in reviewing the entire summary judgment record, including the voluminous submissions by the defendants, the defendants did not point out those facts as to which there were disputes and rebut the evidence proffered by the trustee plaintiff, in this case.*

 (emphasis added).

The court concluded that even if Appellants were not obligated to submit a *separate* statement of disputed facts, they still were required to state clearly and concisely the facts claimed to be disputed, and to rebut the evidence presented by the Trustee in support of his stated material facts. See L.R. D. Mass. 56.1. We agree with the bankruptcy court that the Appellants failed to do so. The bankruptcy court did not err in deeming the Trustee's asserted facts as admitted in light of the Appellants' failure to comply with Local Rule 56.1, or that there were no disputed material facts requiring a trial. See Ríos-Jiménez, 520 F.3d at 39; see also Mateo-Espada, 2005 WL 1640485, at *1.

We must now consider whether the uncontroverted facts asserted by the Trustee and the summary judgment record support the determination that the Trustee was entitled to judgment as a matter of law. See Magríz-Marrero, 933 F. Supp. 2d at 245 (stating the movant must show

27

both that there were no genuine issues of material fact and that he is entitled to judgment as a matter of law).

**B.     The Bankruptcy Court Did Not Err in Concluding the Trustee Was Entitled to Judgment as a Matter of Law**

In the Summary Judgment Order, the bankruptcy court concluded the Trustee had established all the elements under § 548 and MUFTA § 6(a) for avoidance of the Transfers. On appeal, the Appellants argue that the Transfers were not "real transfers" of the Debtor's assets rendering them vulnerable to avoidance under these statutory provisions. Further, they contend that the Trustee failed to show that the Debtor did not receive reasonably equivalent value for the Transfers.

We examine each of these arguments in turn. Because our review is "confined to the record that was properly before the [bankruptcy] court when it made its decision," the question is whether the bankruptcy court "appropriately granted summary judgment *based on the facts set forth in the [Trustee]'s moving papers . . . .*" See Rios-Jimenez, 520 F.3d at 39 (emphasis added) (citation omitted).

### 1.     The Transactions in Fact Constituted "Transfers"

The Bankruptcy Code defines "transfer" broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). MUFTA's definition of "transfer" is essentially the same. See Mass. Gen. Laws ch. 109A, § 2.[11] "The essence of a

---

[11] MUFTA defines the term "transfer" as: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Mass. Gen. Laws ch. 109A, § 2.

transfer is the relinquishment of a valuable property right." Gierum v. Glick (In re Glick), 568 B.R. 634, 672 (Bankr. N.D. Ill. 2017) (citation omitted).

To recap, the Trustee alleged these assets of the Debtor were transferred to Durham: (1) $198,100.33 in collections on the Unfactored Invoices; (2) a wire transfer of $200,000 on February 7, 2013; and (3) the February 7, 2013 transfer of Factored Invoices to Durham with a face value of $951,719.81 for the discounted purchase price of $880,938.40, with $626,699.15 of the purchase price allegedly "advanced" to the Debtor but in fact never actually paid to the Debtor. The Trustee's factual allegations are amply supported by the documentary evidence contained in the summary judgment record and the unrebutted expert report of Penelope Bley, the Trustee's forensic accountant.

The Appellants maintain that none of the transactions were "asset transfers" within the meaning of the fraudulent transfer statutes because they held a perfected security interest in all of the Debtor's accounts receivable by virtue of the Factoring Agreement and the February 7, 2013 Transactions, the *proceeds* (funds collected) on any receivables transferred under the Factoring Agreement became their collateral, and they were "well within their rights" under the loan documents to retain their collateral to secure the Debtor's obligations to Maasai under the purchased DCR Note. Hence, "[b]ecause the receivables and their proceeds constitute collateral . . . then no transfer of any interest [of the Debtor] occurred." The Appellants' argument, however, is unsupported by the uncontroverted facts and the record evidence.

The Appellants did not challenge the Trustee's assertion in his Statement of Material Facts that the Transfers occurred or identify this as a disputed fact. They did not question the qualifications of the Trustee's expert or challenge the admissibility of Ms. Bley's report. They did not specify any fact relied upon by the expert which they controverted, and failed to allege

any specific deficiency in the expert's reasoning and methodology. Nor did they proffer their own expert report or opinion to counter the evidence presented by the Trustee. Although in the argument section of their Opposition to Summary Judgment they contest the Trustee's characterization of the transactions as "transfers," they did not cite to any evidence of an agreement between the Debtor and Durham that the property being transferred was intended to be held as collateral for future advances or that it was applied in satisfaction of any future indebtedness.

On the contrary, the summary judgment record, including the Appellants' own accounting records and answers to interrogatories, demonstrates that through the Transfers the Debtor relinquished, indirectly and/or involuntarily, a "valuable property right"—its right to payment from its clients for legal services rendered. The Appellants' insistence that there were no transfers of the Debtor's property is simply unsupported by the undisputed facts and the summary judgment record. At bottom, the Appellants failed to satisfy their burden of producing "specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Brooks, 480 F.3d at 586 (citation omitted). The evidence amply supports the conclusion that there was a "transfer" of the Debtor's property to Durham during the relevant period.

### 2. The Debtor Did Not Receive Reasonably Equivalent Value for the Transfers

The Appellants similarly fail to meet their burden to rebut the Trustee's evidence establishing the Debtor did not receive reasonably equivalent value in exchange for the Transfers.

### (a) Applicable Standard

We note first that "[t]he analysis of what constitutes 'reasonably equivalent value' under the relevant sections of the Massachusetts UFTA mirrors the analysis of 'reasonably equivalent

30

value' under [ ] § 548." Agin v. Grasso (In re Luciani), 584 B.R. 449, 455 (Bankr. D. Mass. 2018) (citations omitted). "Determination of reasonably equivalent value under § 548(a)(1)(B) is a two-step process," requiring the court to "first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave." In re Feeley, 429 B.R. at 63 (citation omitted). "[A] reasonably equivalent value determination should be based on all of the facts and circumstances of the case." In re Duplication Mgmt., Inc., 501 B.R. at 484 (citation omitted).

"The term 'reasonably equivalent value' is not defined in the statute, but it does not include intangible, emotional, and non-economic benefits." In re Palladino, 942 F.3d at 59 (citation omitted). "Because fraudulent transfer law's purpose is to preserve the debtor's estate for the benefit of unsecured creditors, courts evaluate transfers from the creditors' perspective, measuring value at the time of the transfer[.]" Id. (citations omitted). "The [C]ode recognizes five classes of transactions that confer value: (1) the exchange of property; (2) the satisfaction of a present debt; (3) the satisfaction of an antecedent debt; (4) the securing or collateralizing of a present debt; and (5) the granting of security for the purpose of securing an antecedent debt." Id. (citing 11 U.S.C. § 548(d)(2)(A)). If a court determines that some value was exchanged, it should then "compare what was given with what was received." In re Feeley, 429 B.R. at 63 (citation omitted).

Accordingly, "[t]o make out the elements of a fraudulent conveyance claim, a plaintiff must prove that a debtor did not receive direct benefits reasonably equivalent to the value which it gave up." In re Duplication Mgmt., Inc., 501 B.R. at 483 (citations omitted). "Once the plaintiff makes a prima facie showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient indirect benefit that is tangible and

31

concrete," and "*to quantify* their value with reasonable precision." Id. (citations omitted); see

also Official Comm. of Unsecured Creditors v. Citicorp. N. Am., Inc. (In re TOUSA, Inc.),

422 B.R. 783, 867-68 (Bankr. S.D. Fla. 2009) (stating that any purported "indirect benefits" must

have "cognizable 'value'") (citations omitted).

### (b)     Applying the Standard

The bankruptcy court concluded that the primary consideration received by the Debtor in

exchange for the Transfers was access to capital, including the removal of obstacles which would

have prevented the Debtor from entering into the Factoring Agreement with Durham (such as

DCR's first priority security interest in the Debtor's accounts receivable).  The court also found

that the benefit received by the Debtor was not reasonably equivalent in value to the amount of

the Transfers.  The undisputed facts and the record support this conclusion.

At his Rule 30(b) deposition, Durham's president described how the Transfers and the

February 7, 2013 Transactions afforded the Debtor access to capital through receivables

factoring "so that they c[ould] not only continue to operate but to expand."  He stated:

> [The Debtor] . . . didn't have any money.  They didn't have any ability to get any money.  Right?  Because you've got a $4.5 million real estate loan, which is collateralized against the law firm.  You also have a $1.5 million loan, which is collateralized against the assets of the law firm.

> [A]s the law firm goes out and tries to borrow any money from a bank or a finance company or anything, right, you have . . . $6 million in first liens against those trading assets of the company.

> So if you're going to loan any money to the company or get any cash into the company whatsoever, you've got to remove those, right?  [ ] [Y]ou're going to have to remove $1.5 million in revolving credit and $4 million in real estate loans.

> So what did we do as part of this transaction?  We moved the whole $1.5 million of the revolving loan, right, and entered into a forbearance agreement so they wouldn't have to pay on it, right?

And then, secondly, we unbuckled the primary real estate loan, which was against the assets, and got DCR to agree to remove their UCC filings against the assets of the law firm.

Now the law firm is free to go and borrow money against their accounts receivable so that they can not only continue to operate but to expand.

. . . .

[A] foreclosure firm has to have capital, and they did not have access to capital until we did this transaction for them.

Viewing the transactions in their entirety, the Trustee's valuation expert, Richard A. Clarke, opined on the nature of the consideration the Debtor received in exchange for the Transfers. He stated:

> To determine what the Debtor received in exchange for the Transfers, I examined the changes to the Debtor's financial position and debtor-creditor relationships before and after the Transfers resulting from the execution and delivery of the February 7, 2013 transactional documents. There were two noteworthy changes. <u>First</u>, the Debtor's guaranty of SSA's [sic] mortgage obligations was converted from a secured guaranty to an unsecured guaranty. <u>Second</u>, Durham's affiliate, Maasai, now held the DCR Note which was secured by the Debtor's accounts receivable and other assets. This enabled the Debtor to factor its receivables free of DCR's liens. While the factored receivables appear to have remained subject to the liens of ServiceLink, the prior security interest of DCR that was assigned to Maasai to secure the DCR Note impaired any effective effort by ServiceLink to exercise its secured party rights. Thus, ServiceLink was effectively blocked from intervening to thwart the factoring of receivables to Durham.

> Thus, the entire arrangement as reflected in the various transactional documents executed as of February 7, 2013 effectively enabled the Debtor to proceed with a factoring arrangement with Durham. It is my opinion that this was the primary, if not sole, benefit to the Debtor in making the Transfers to Durham.

But most significantly, Mr. Clarke opined that "the Debtor received *no consideration of any monetary value* in exchange for the Transfers," and what the Debtor did receive *was not reasonably equivalent in value* to the property transferred. He concluded:

> It is my opinion that the Debtor did not receive reasonably equivalent in exchange for the Transfers. For the reasons stated above, all the Debtor received in exchange for the Transfers was an opportunity to factor receivables

33

to Durham. The cost to the Debtor for Factoring Receivables is set forth in the factoring agreement itself. As explained above, the Debtor paid an origination fee in exchange for the credit facility and further fees in exchange for each factored receivable. The fees set out in the Factoring Agreement alone establish the consideration which the Debtor and Durham agreed would be paid for the Debtor's invoices.

Although providing access to capital may, in certain circumstances, constitute "tangible and concrete" value, here the Appellants fell short because they failed to provide evidence quantifying the value of such capital access with "reasonable precision." See In re Duplication Mgmt., Inc., 501 B.R. at 483.

The Appellants also contend that the Debtor received "direct, equivalent value" for the Transfers, to wit: (1) the Debtor's removal of the $1,362,822.21 balance due on the DCR Note from its balance sheet after Maasai purchased the DCR Note for the discounted price of $700,000, resulting in the Debtor's (alleged) "receipt" of a $662,822 discount on the DCR Note; and (2) the release of the cross-collateralization of the obligations guaranteed by the Debtor, the release of the SAA mortgages, and DCR's forbearance from exercising rights under the loan documents not sold to Maasai. But the Appellants failed to produce any evidence as to the value of this purported consideration or otherwise support their repeated assertions that the benefit conferred on the Debtor was reasonably equivalent in value to the property transferred to Durham. They interposed no challenge to the admissibility of the report of the Trustee's value expert and did not proffer any expert value opinion of their own.

In short, the Appellants' assertion of "value" given to the Debtor is unquantified and unsupported by the summary judgment record. We find no error with the bankruptcy court's conclusion that the uncontroverted evidence demonstrated that the Debtor did not receive reasonably equivalent value for the Transfers.

## C. Section 550 - Recovery against Durham and Maasai

Section 550(a)(1) authorizes the Trustee to recover an avoided transfer from both the "initial transferee" and "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Here, the bankruptcy court determined that the Trustee proved that the Debtor fraudulently transferred property to Durham which it, in turn, transferred to Maasai to acquire the DCR Note. Consequently, it ruled that the Trustee was entitled to recover the value of the transferred property from both Durham, as the initial transferee, and Maasai, as the entity for whose benefit the Transfers were made.

The Appellants' only challenge to this ruling is that the bankruptcy court "should have excluded $263,989 comprised of closing costs and fees required under the Factoring Agreement from any award of summary judgment to the Trustee." According to the Appellants, this sum (derived from the $963,989 transferred to Durham by the Debtor under the Factoring Agreement) was paid to third parties to pay taxes, utilities, legal fees and other related costs, or for "legal fees and factoring fees" to which Durham was entitled under the Factoring Agreement. At a minimum, they contend, funds in this amount are not recoverable from the Appellants as fraudulent transfers. Like the bankruptcy court, we disagree. The parties intended the funds to be used to enable Maasai to purchase the DCR Note, and these funds were in fact transferred to Maasai and used by it to purchase the DCR Note. Any payments of the funds to third parties were mandated as part of the DCR note purchase transaction. Thus, the full value of the avoided Transfers is recoverable from both Durham and Maasai.

## D. Prejudgment Interest Award at State Statutory Rate

The Appellants challenge as excessive the bankruptcy court's award of $317,687.83 in prejudgment interest on the Fraudulent Transfer Claims. They argue that the court ignored "the

well-established principle that an award of prejudgment interest is intended to be compensatory —and not punitive—in purpose and nature." In their view, the appropriate calculation of interest is an amount that fairly compensates the estate for the interest it might have earned on the principal award during the period from the Trustee's demand to judgment. The Appellants suggest that this sum is in the range of $1,500 to $20,000, or alternatively, should be calculated at the federal interest rate of 2.42%.

"Neither the Bankruptcy Code nor the United States Code contain a general statute granting prejudgment interest. Therefore, prejudgment interest is generally subject to the court's discretion depending on the equities of the case." In re Keefe, 401 B.R. at 526 (citation omitted). "The purpose of prejudgment interest is not punitive but compensatory, and the court may award prejudgment interest to make the injured party 'whole.'" Id. (citation omitted). "Because these interests are 'paramount' in preference and fraudulent conveyance proceedings, 'courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or fraudulent transfer from the time demand is made or an adversary proceeding is instituted.'" Id. (citation omitted). "Therefore, the question becomes what is the applicable rate of prejudgment interest—the federal or state rate?" Id.

Courts have reached different conclusions regarding whether federal or state law governs the prejudgment interest rate in fraudulent transfer actions brought by a bankruptcy trustee. Id. at 526-27 (citing cases). Some apply the state law interest rate on fraudulent transfer judgments arising under § 544(b) because the cause of action is predicated on state law. In re Keefe, 401 B.R. at 527 (citing cases). Others apply the federal rate to fraudulent conveyance judgments whether arising under §§ 544 or 548. Id. (citing cases).

In Keefe, the Panel held that when determining the governing law for prejudgment interest, it is appropriate to look to the "source of the claim." Id. at 526. If federal law gives rise to the claim, federal law governs the rate of prejudgment interest to be applied. Id. (citation omitted). If, however, "state law provides the substantive basis for a judgment, . . . state law should govern the determination of prejudgment interest." Id. at 527.[12] This approach is consistent with First Circuit case law. See Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 678 F.3d 115, 125 (1st Cir. 2012) (instructing that "[w]hen state-law claims . . . are adjudicated by a federal court, prejudgment interest is normally a matter of state law") (citation omitted). Other courts have similarly looked to the source of the claim and applied the state law interest rate for determining prejudgment interest on fraudulent transfer judgments arising under § 544(b).[13]

---

[12] In Keefe, as here, the trustee brought claims under §§ 544(b) and 550 of the Bankruptcy Code and the Massachusetts fraudulent transfer statute. In re Keefe, 401 B.R. at 527. The Keefe panel observed that § 544(b) simply provided the procedural mechanism by which the trustee could assert his Massachusetts fraudulent transfer claim, and § 550 merely identified the entities from whom recovery could be made. Id. The Keefe panel determined, therefore, that neither § 544(b) nor § 550 was the substantive basis for the judgment; rather, the Massachusetts fraudulent transfer statute provided the substantive basis for the trustee's claim. Id. The Keefe panel concluded that the bankruptcy court did not abuse its discretion in applying the state law prejudgment interest rate to the trustee's damages award. Id.

[13] See, e.g., Kittay v. Korff (In re Palermo), 739 F.3d 99, 107 (2d Cir. 2014) (stating that "look[ing] to the source of the law underlying plaintiff's claims" is "the proper framework" for this analysis, and state law is applicable to determining the rate of interest in a § 544(b) fraudulent transfer recovery); Von Guten v. Neilson (In re Slatkin), 243 F. App'x 255, 259-60 (9th Cir. 2007) (concluding that bankruptcy court did not abuse its discretion in looking to state law to determine the applicable rate for prejudgment interest on the trustee's claims under § 544(b)); Brincko v. Rio Props., Inc. (In re Nat'l Consumer Mortg., LLC), No. 2:10-CV-00930-PMP-PAL, 2014 WL 1873960, at *6 (D. Nev. May 8, 2014) (same); Kelley v. Home Fed. Sav. Bank (In re Petters Co.), 603 B.R. 601, 609-10 (Bankr. D. Minn. 2019) (awarding prejudgment interest on fraudulent transfer claim under § 544(b) at state statutory rate); Floyd v. Option One Mortg. Corp. (In re Supplement Spot, LLC), 409 B.R. 187, 208 (Bankr. S.D. Tex. 2009) (applying state law rate when calculating prejudgment interest for trustee's fraudulent transfer claim).

The First Circuit has also held that when both federal and state law are implicated, the prevailing plaintiff is entitled to choose the body of law under which damages will be paid. See Foley v. City of Lowell, 948 F.2d 10, 17 (1st Cir. 1991) (stating it is "well accepted" that "where parallel claims are brought under both federal and state laws, and the damages recovered are duplicative, i.e., not segregated into separate federal and state components, a prevailing plaintiff is entitled to select the body of law under which the damages will be paid"); see also Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146 (1st Cir. 2009) (explaining that "a successful plaintiff's right to a particular remedy under federal law does not trump his right to a more advantageous remedy under state law"). Thus, "[w]hen federal and state claims overlap, the plaintiff may choose to be awarded damages based on state law if that law offers a more generous outcome than federal law." Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 124 (1st Cir. 2016) (citation omitted). "[A]lthough a prevailing plaintiff in such a situation is 'entitled to only a single slice of the pie[,] . . . the choice of the slice [is] his[/ hers.]'" Id. (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1345 (1st Cir. 1988)).

Here, the Trustee brought the Fraudulent Transfer Claims under both federal and state fraudulent transfer statutes and he prevailed under both statutes. He was entitled to request an award of prejudgment interest under the state law statutory rate.

For Massachusetts tort actions, Mass. Gen. Laws ch. 231, § 6B, governs the award of prejudgment interest. See Gen. Elec. Co. Bus. Lighting Grp. v. Halmar Distribs., Inc. (In re Halmar Distribs., Inc.), 232 B.R. 18, 22 (Bankr. D. Mass. 1999) (citing Sugarman v. Sugarman, 797 F.2d 3, 14 (1st Cir. 1986)). The statute provides:

> In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of the court to the amount of damages interest thereon at the rate of twelve

38

per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

Mass. Gen. Laws ch. 231, § 6B. Based on this provision, the bankruptcy court did not abuse its discretion in awarding prejudgment interest at the Massachusetts rate of 12% from the date on which the Trustee commenced the adversary proceeding.

The Appellants go further and attack the interest awarded as not proportionate to the actual economic harm suffered by the estate and, as such, excessive rather than compensatory. They assert that because approximately one-third of the Trustee's recovery consists of prejudgment interest, the amount awarded is simply unreasonable.

It is well-established in this circuit that the granting of prejudgment interest is discretionary and should be compensatory rather than punitive. See In re Duplication Mgmt., Inc., 501 B.R. at 489; In re Keefe, 401 B.R. at 526. In awarding prejudgment interest, a court has discretion to adjust an interest award if the prevailing party is responsible for undue delay or if equitable considerations warrant the denial of prejudgment interest. See Foley, 948 F.2d at 17-18 ("[A] trial court has some discretion under Massachusetts practice to adjust an interest award if a prevailing litigant has been responsible for unnecessary delays.") (citation omitted); Monte Carlo Cruise Concessions, Inc. v. Lassman, No. Civ. A. 04-12215 DPW, 2005 WL 352858, at *6 (D. Mass. Feb. 8, 2005) ("[I]n the absence of equitable considerations warranting its denial[,] prejudgment interest will be awarded when the amount of judgment is ascertainable.") (citations omitted). Here, the bankruptcy court determined that there was no reason for a downward adjustment; the litigation took two and a half years to complete and the record reflected that the Trustee diligently prosecuted the action and had not engaged in litigation

tactics resulting in delay or unfairness. The record fully supports the bankruptcy court's prejudgment interest award.

## CONCLUSION

For the reasons set forth above, we conclude that the bankruptcy court did not err in granting summary judgment in favor of the Trustee. The Appellants failed to satisfy their burden of producing "specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Brooks, 480 F.3d at 586. They did not demonstrate that, based on the uncontroverted facts presented by the Trustee, he was not entitled to judgment as a matter of law. We further conclude that the bankruptcy court did not abuse its discretion in awarding the Trustee prejudgment interest at the Massachusetts statutory rate without reduction. We **AFFIRM** the Summary Judgment Order and the Judgment.